# WASHINGTON ET AL. *v.* HARPER

No. 88–599.  Argued October 11, 1989—Decided February 27, 1990

212

KENNEDY, J., delivered the opinion for a unanimous Court with respect to Part II, and the opinion of the Court with respect to Parts I, III, IV, and V, in which REHNQUIST, C. J., and WHITE, BLACKMUN, O'CONNOR, and SCALIA, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 236. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 237.

*William L. Williams*, Senior Assistant Attorney General of Washington, argued the cause for petitioners. With him on the briefs were *Kenneth O. Eikenberry*, Attorney General, and *Glenn L. Harvey*, Assistant Attorney General.

*Paul J. Larkin, Jr.*, argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief was *William C. Bryson*, Acting Solicitor General.

*Brian Reed Phillips*, by appointment of the Court, 490 U. S. 1002, argued the cause for respondent. With him on the brief was *Leonard Rubenstein.**

JUSTICE KENNEDY delivered the opinion of the Court.

The central question before us is whether a judicial hearing is required before the State may treat a mentally ill prisoner with antipsychotic drugs against his will. Resolution of the case requires us to discuss the protections afforded the prisoner under the Due Process Clause of the Fourteenth Amendment.

I

Respondent Walter Harper was sentenced to prison in 1976 for robbery. From 1976 to 1980, he was incarcerated at the Washington State Penitentiary. Most of that time, respondent was housed in the prison's mental health unit, where he consented to the administration of antipsychotic drugs.

---

*Briefs of *amici curiae* urging reversal were filed for the State of California by *John K. Van de Kamp*, Attorney General, *Richard B. Iglehart*, Chief Assistant Attorney General, *Kenneth C. Young*, Assistant Attorney General, *Kristofer Jorstad*, Senior Supervising Deputy Attorney General, and *Morris Lenk*, *Karl S. Mayer*, and *Bruce M. Slavin*, Deputy Attorneys General; and for the American Psychiatric Association et al. by *Joel I. Klein* and *Robert D. Luskin*.

Briefs of *amici curiae* urging affirmance were filed for the Mental Health Legal Advisors Committee of the Massachusetts Supreme Judicial Court et al. by *Stan Goldman*, *Robert D. Fleischner*, and *Steven J. Schwartz;* for the National Association of Protection and Advocacy Systems et al. by *Arthur J. Rosenberg;* and for the New Jersey Department of the Public Advocate by *Linda G. Rosenzweig*.

Briefs of *amici curiae* were filed for the American Psychological Association by *Clifford D. Stromberg* and *John G. Roberts, Jr.;* for the Coalition for the Fundamental Rights and Equality of Ex-Patients by *Peter Margulies;* and for the Washington Community Mental Health Council et al. by *Barbara A. Weiner*.

Antipsychotic drugs, sometimes called "neuroleptics" or "psychotropic drugs," are medications commonly used in treating mental disorders such as schizophrenia. Brief for American Psychiatric Association et al. as *Amici Curiae* 2–3, n. 1. As found by the trial court, the effect of these and similar drugs is to alter the chemical balance in the brain, the desired result being that the medication will assist the patient in organizing his or her thought processes and regaining a rational state of mind. See App. to Pet. for Cert. B–7.[1]

Respondent was paroled in 1980 on the condition that he participate in psychiatric treatment. While on parole, he continued to receive treatment at the psychiatric ward at Harborview Medical Center in Seattle, Washington, and was later sent to Western State Hospital pursuant to a civil commitment order. In December 1981, the State revoked respondent's parole after he assaulted two nurses at a hospital in Seattle.

Upon his return to prison, respondent was sent to the Special Offender Center (SOC or Center), a 144-bed correctional institute established by the Washington Department of Corrections to diagnose and treat convicted felons with serious mental disorders. At the Center, psychiatrists first diagnosed respondent as suffering from a manic-depressive disorder.[2] At first, respondent gave voluntary consent to treatment, including the administration of antipsychotic medications. In November 1982, he refused to continue taking the prescribed medications. The treating physician then sought to medicate respondent over his objections, pursuant to SOC Policy 600.30.

---

[1] The drugs administered to respondent included Trialafon, Haldol, Prolixin, Taractan, Loxitane, Mellaril, and Navane. See App. to Pet. for Cert. B–7. Like the Washington Supreme Court, we limit our holding to the category of antipsychotic drugs. See 110 Wash. 2d 873, 876, n. 3, 759 P. 2d 358, 361, n. 3 (1988).

[2] Since that initial diagnosis, respondent has also been thought to have been suffering from schizo-affective disorder, and his current diagnosis is that he is schizophrenic.

Policy 600.30 was developed in partial response to this Court's decision in *Vitek* v. *Jones*, 445 U. S. 480 (1980). The Policy has several substantive and procedural components. First, if a psychiatrist determines that an inmate should be treated with antipsychotic drugs but the inmate does not consent, the inmate may be subjected to involuntary treatment with the drugs only if he (1) suffers from a "mental disorder" and (2) is "gravely disabled" or poses a "likelihood of serious harm" to himself, others, or their property.[3] Only a psychiatrist may order or approve the medication. Second, an inmate who refuses to take the medication voluntarily is entitled to a hearing before a special committee consisting of a psychiatrist, a psychologist, and the Associate Superintendent of the Center, none of whom may be, at the time of the hearing, involved in the inmate's treatment or diagnosis. If the committee determines by a majority vote that the inmate suffers from a mental disorder and is gravely disabled or dan-

---

[3] The Policy's definitions of the terms "mental disorder," "gravely disabled," and "likelihood of serious harm" are identical to the definitions of the terms as they are used in the state involuntary commitment statute. See App. to Pet. for Cert. B–3. "Mental disorder" means "any organic, mental, or emotional impairment which has substantial adverse effects on an individual's cognitive or volitional functions." Wash. Rev. Code § 71.05.020(2) (1987). "Gravely disabled" means "a condition in which a person, as a result of a mental disorder: (a) [i]s in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety, or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." § 71.05.020(1). "Likelihood of serious harm" means "either: (a) [a] substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, or (c) a substantial risk that physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others." § 71.05.020(3).

gerous, the inmate may be medicated against his will, provided the psychiatrist is in the majority.

Third, the inmate has certain procedural rights before, during, and after the hearing. He must be given at least 24 hours' notice of the Center's intent to convene an involuntary medication hearing, during which time he may not be medicated. In addition, he must receive notice of the tentative diagnosis, the factual basis for the diagnosis, and why the staff believes medication is necessary. At the hearing, the inmate has the right to attend; to present evidence, including witnesses; to cross-examine staff witnesses; and to the assistance of a lay adviser who has not been involved in his case and who understands the psychiatric issues involved. Minutes of the hearing must be kept, and a copy provided to the inmate. The inmate has the right to appeal the committee's decision to the Superintendent of the Center within 24 hours, and the Superintendent must decide the appeal within 24 hours after its receipt. See App. to Pet. for Cert. B–3. The inmate may seek judicial review of a committee decision in state court by means of a personal restraint petition or extraordinary writ. See Wash. Rules App. Proc. 16.3 to 16.17; App. to Pet. for Cert. B–8.

Fourth, after the initial hearing, involuntary medication can continue only with periodic review. When respondent first refused medication, a committee, again composed of a nontreating psychiatrist, a psychologist, and the Center's Associate Superintendent, was required to review an inmate's case after the first seven days of treatment. If the committee reapproved the treatment, the treating psychiatrist was required to review the case and prepare a report for the Department of Corrections medical director every 14 days while treatment continued.[4]

---

[4] The Policy was later amended to allow treatment for up to 14 days after the first hearing. Further treatment could be authorized only after the same committee conducted a second hearing on the written record. Thereafter, the treating psychiatrist was required to submit biweekly re-

In this case, respondent was absent when members of the Center staff met with the committee before the hearing. The committee then conducted the hearing in accordance with the Policy, with respondent being present and assisted by a nurse practitioner from another institution. The committee found that respondent was a danger to others as a result of a mental disease or disorder, and approved the involuntary administration of antipsychotic drugs. On appeal, the Superintendent upheld the committee's findings. Beginning on November 23, 1982, respondent was involuntarily medicated for about one year. Periodic review occurred in accordance with the Policy.

In November 1983, respondent was transferred from the Center to the Washington State Reformatory. While there, he took no medication, and as a result, his condition deteriorated. He was retransferred to the Center after only one month. Respondent was the subject of another committee hearing in accordance with Policy 600.30, and the committee again approved medication against his will. Respondent continued to receive antipsychotic drugs, subject to the required periodic reviews, until he was transferred to the Washington State Penitentiary in June 1986.

In February 1985, respondent filed suit in state court under 42 U. S. C. § 1983 (1982 ed.) against various individual defendants and the State, claiming that the failure to provide a judicial hearing before the involuntary administration of antipsychotic medication violated the Due Process, Equal Protection, and Free Speech Clauses of both the Federal and State Constitutions, as well as state tort law. He sought both damages and declaratory and injunctive relief. After a bench trial in March 1987, the court held that, although respondent had a liberty interest in not being subjected to the involuntary administration of antipsychotic medication, the

ports to the Department of Corrections medical director. At the end of 180 days, a new hearing was required to consider the need for continued treatment.

procedures contained in the Policy met the requirements of due process as stated in *Vitek*.

On appeal, the Washington Supreme Court reversed and remanded the case to the trial court. 110 Wash. 2d 873, 759 P. 2d 358 (1988). Agreeing with the trial court that respondent had a liberty interest in refusing antipsychotic medications, the court concluded that the "highly intrusive nature" of treatment with antipsychotic medications warranted greater procedural protections than those necessary to protect the liberty interests at stake in *Vitek*. 110 Wash. 2d, at 880–881, 759 P. 2d, at 363. It held that, under the Due Process Clause, the State could administer antipsychotic medication to a competent, nonconsenting inmate only if, in a judicial hearing at which the inmate had the full panoply of adversarial procedural protections, the State proved by "clear, cogent, and convincing" evidence that the administration of antipsychotic medication was both necessary and effective for furthering a compelling state interest.[5] *Id.*, at 883–884, 759 P. 2d, at 364–365.

We granted certiorari, 489 U. S. 1064 (1989), and we reverse.

## II

Respondent contends that because the State has ceased administering antipsychotic drugs to him against his will, the case is moot. We disagree.

Even if we confine our attention to those facts found in the record,[6] a live case or controversy between the parties re-

---

[5] Because it decided the case on due process grounds, the court did not address respondent's equal protection or free speech claims, and they are not before us here. The court also concluded that the individual defendants were entitled to qualified immunity, but remanded the case to the lower court for further consideration of respondent's claims for injunctive and declaratory relief under § 1983, as well as of his claims under state law. See 110 Wash. 2d, at 885–886, 759 P. 2d, at 366.

[6] In response to our questions at oral argument, counsel for the State informed us that respondent was transferred back to the Center in April 1987 and involuntarily medicated pursuant to the Policy from September

mains. There is no evidence that respondent has recovered from his mental illness. Since being sentenced to prison in 1976, he has been diagnosed and treated for a serious mental disorder. Even while on parole, respondent continued to receive treatment, at one point under a civil commitment order, at state mental hospitals. At the time of trial, after his transfer from the Center for a second time, respondent was still diagnosed as suffering from schizophrenia.

Respondent continues to serve his sentence in the Washington state prison system, and is subject to transfer to the Center at any time. Given his medical history, and the fact that he has been transferred not once but twice to the Center from other state penal institutions during the period 1982–1986, it is reasonable to conclude that there is a strong likelihood that respondent may again be transferred to the Center. Once there, given his medical history, it is likely that, absent the holding of the Washington Supreme Court, Center officials would seek to administer antipsychotic medications pursuant to Policy 600.30.

On the record before us, the case is not moot. The alleged injury likely would recur but for the decision of the Washington Supreme Court. This sufficiently overcomes the claim of mootness in the circumstances of the case and under our precedents. See *Vitek*, 445 U. S., at 486–487.

### III

The Washington Supreme Court gave its primary attention to the procedural component of the Due Process Clause. It phrased the issue before it as whether "a prisoner [is] entitled to a judicial hearing before antipsychotic drugs can be administered against his will." 110 Wash. 2d, at 874, 759 P. 2d, at 360. The court, however, did more than establish ju-

---

1987 until May 1988. Counsel also informed us that, at the time of oral argument, respondent was at a state mental hospital for a competency determination on an unrelated criminal charge, and that regardless of the outcome of this criminal charge, respondent will return to the state prison system to serve the remainder of his sentence.

dicial procedures for making the factual determinations called for by Policy 600.30. It required that a different set of determinations than those set forth in the Policy be made as a precondition to medication without the inmate's consent. Instead of having to prove, pursuant to the Policy, only that the mentally ill inmate is "gravely disabled" or that he presents a "serious likelihood of harm" to himself or others, the court required the State to prove that it has a compelling interest in administering the medication and that the administration of the drugs is necessary and effective to further that interest. The decisionmaker was required further to consider and make written findings regarding either the inmate's desires or a "substituted judgment" for the inmate analogous to the medical treatment decision for an incompetent person. *Id.*, at 883–884, 759 P. 2d, at 365.

The Washington Supreme Court's decision, as a result, has both substantive and procedural aspects. It is axiomatic that procedural protections must be examined in terms of the substantive rights at stake. But identifying the contours of the substantive right remains a task distinct from deciding what procedural protections are necessary to protect that right. "[T]he substantive issue involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. The procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Mills* v. *Rogers*, 457 U. S. 291, 299 (1982) (citations omitted).

Restated in the terms of this case, the substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient. The Washington Supreme Court in effect ruled upon the substance of the inmate's right, as well as the

procedural guarantees, and both are encompassed by our grant of certiorari.[7] We address these questions beginning with the substantive one.

As a matter of state law, the Policy itself undoubtedly confers upon respondent a right to be free from the arbitrary administration of antipsychotic medication. In *Hewitt* v. *Helms*, 459 U. S. 460 (1983), we held that Pennsylvania had created a protected liberty interest on the part of prison inmates to avoid administrative segregation by enacting regulations that "used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed, and that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for control,' or 'the threat of a serious disturbance.'" *Id.*, at 471–472 (citations omitted). Policy 600.30 is similarly mandatory in character. By permitting a psychiatrist to treat an inmate with antipsychotic drugs against his wishes only if he is found to be (1) mentally ill and (2) gravely disabled or dangerous, the Policy creates a justifiable expectation on the part of the inmate that the drugs will not be administered unless those conditions exist. See also *Vitek*, 445 U. S., at 488–491.

We have no doubt that, in addition to the liberty interest created by the State's Policy, respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the

---

[7] The two questions presented by the State in its petition for certiorari mirror the division between the substantive and procedural aspects of this case. In addition to seeking a grant of certiorari on the question whether respondent was entitled to "a judicial hearing and attendant adversarial procedural protections" prior to the involuntary administration of antipsychotic drugs, the State sought certiorari on the question, assuming that respondent "possesses a constitutionally protected liberty interest in refusing medically prescribed antipsychotic medication," whether the State must "prove a compelling state interest . . . or [whether] the 'reasonable relation' standard of *Turner* v. *Safley*, [482 U. S. 78 (1987),] control[s]." Pet. for Cert. i.

Fourteenth Amendment. See *id.*, at 491–494; *Youngberg* v. *Romeo*, 457 U. S. 307, 316 (1982); *Parham* v. *J. R.*, 442 U. S. 584, 600–601 (1979). Upon full consideration of the state administrative scheme, however, we find that the Due Process Clause confers upon respondent no greater right than that recognized under state law.

Respondent contends that the State, under the mandate of the Due Process Clause, may not override his choice to refuse antipsychotic drugs unless he has been found to be incompetent, and then only if the factfinder makes a substituted judgment that he, if competent, would consent to drug treatment. We disagree. The extent of a prisoner's right under the Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement. The Policy under review requires the State to establish, by a medical finding, that a mental disorder exists which is likely to cause harm if not treated. Moreover, the fact that the medication must first be prescribed by a psychiatrist, and then approved by a reviewing psychiatrist, ensures that the treatment in question will be ordered only if it is in the prisoner's medical interests, given the legitimate needs of his institutional confinement.` These standards, which rec-

---

`JUSTICE STEVENS contends that the SOC Policy permits respondent's doctors to treat him with antipsychotic medications against his will without reference to whether the treatment is medically appropriate. See *post*, at 243–245. For various reasons, we disagree. That an inmate is mentally ill and dangerous is a necessary condition to medication, but not a sufficient condition; before the hearing committee determines whether these requirements are met, the inmate's treating physician must first make the decision that medication is appropriate. The SOC is a facility whose purpose is not to warehouse the mentally ill, but to diagnose and treat convicted felons, with the desired goal being that they will recover to the point where they can function in a normal prison environment. App. to Pet. for Cert. B–2. In keeping with this purpose, an SOC psychiatrist must first prescribe the antipsychotic medication for the inmate, and the inmate must refuse it, before the Policy is invoked. Unlike JUSTICE STEVENS, we will not assume that physicians will prescribe these drugs for reasons unrelated to the medical needs of the patients; indeed, the ethics of the medical profession are to

ognize both the prisoner's medical interests and the State's interests, meet the demands of the Due Process Clause.

The legitimacy, and the necessity, of considering the State's interests in prison safety and security are well established by our cases. In *Turner* v. *Safley*, 482 U. S. 78 (1987), and *O'Lone* v. *Estate of Shabazz*, 482 U. S. 342 (1987), we held that the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is "reasonably related to legitimate penological interests." *Turner, supra,* at 89. This is true even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review. *Estate of Shabazz, supra,* at 349. The Washington Supreme Court declined to apply this standard of review to the Center's Policy, reasoning that the liberty interest present here was distinguishable from the First Amendment rights at issue in both *Turner* and *Estate of Shabazz.* 110 Wash. 2d, at 883, n. 9, 759 P. 2d, at 364, n. 9. The court erred in refusing to apply the standard of reasonableness.

Our earlier determination to adopt this standard of review was based upon the need to reconcile our longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult

the contrary. See Hippocratic Oath; American Psychiatric Association, Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry, in Codes of Professional Responsibility 129–135 (R. Gorlin ed. 1986). This consideration supports our interpretation of the State's Policy as ensuring that antipsychotic medications will be administered only in those cases where appropriate by medical standards. We therefore agree with the State's representations at oral argument that, under the Policy, antipsychotic medications can be administered only for treatment purposes, with the hearing committee reviewing the doctor's decision to ensure that what has been prescribed is appropriate. See Tr. of Oral Arg. 13, 16.

decisions regarding prison administration. *Turner, supra,* at 84–85; *Jones* v. *North Carolina Prisoners' Labor Union, Inc.,* 433 U. S. 119, 128 (1977). These two principles apply in all cases in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment. We made quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights. See *Turner,* 482 U. S., at 85 ("Our task . . . is to formulate a standard of review for prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights'") (citation omitted); *id.,* at 89 ("If *Pell, Jones,* and *Bell* have not already resolved the question posed in [*Procunier* v.] *Martinez,* [416 U. S. 396 (1974),] we resolve it now: when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests"); *Estate of Shabazz, supra,* at 349 ("To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights"). In *Turner* itself we applied the reasonableness standard to a prison regulation that imposed severe restrictions on the inmate's right to marry, a right protected by the Due Process Clause. See *Turner, supra,* at 95–96 (citing *Zablocki* v. *Redhail,* 434 U. S. 374 (1978), and *Loving* v. *Virginia,* 388 U. S. 1 (1967)). Our precedents require application of the standard here.

In *Turner,* we considered various factors to determine the reasonableness of a challenged prison regulation. Three are relevant here. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U. S.,

at 89 (quoting *Block* v. *Rutherford*, 468 U. S. 576, 586 (1984)). Second, a court must consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." 482 U. S., at 90. Third, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation," but this does not mean that prison officials "have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.*, at 90–91; see also *Estate of Shabazz, supra*, at 350.

Applying these factors to the regulation before us, we conclude that the Policy comports with constitutional requirements. There can be little doubt as to both the legitimacy and the importance of the governmental interest presented here. There are few cases in which the State's interest in combating the danger posed by a person to both himself and others is greater than in a prison environment, which, "by definition," is made up of persons with "a demonstrated proclivity for antisocial criminal, and often violent, conduct." *Hudson* v. *Palmer*, 468 U. S. 517, 526 (1984); *Jones, supra*, at 132; *Wolff* v. *McDonnell*, 418 U. S. 539, 561–562 (1974). We confront here the State's obligations, not just its interests. The State has undertaken the obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution. Prison administrators have not only an interest in ensuring the safety of prison staffs and administrative personnel, see *Hewitt*, 459 U. S., at 473, but also the duty to take reasonable measures for the prisoners' own safety. See *Hudson, supra*, at 526–527. These concerns have added weight when a penal institution, like the SOC, is restricted to inmates with mental illnesses. Where an inmate's mental disability is the root cause of the threat he poses to the inmate population, the State's interest in decreasing the

danger to others necessarily encompasses an interest in providing him with medical treatment for his illness.

SOC Policy 600.30 is a rational means of furthering the State's legitimate objectives. Its exclusive application is to inmates who are mentally ill and who, as a result of their illness, are gravely disabled or represent a significant danger to themselves or others. The drugs may be administered for no purpose other than treatment, and only under the direction of a licensed psychiatrist. There is considerable debate over the potential side effects of antipsychotic medications, but there is little dispute in the psychiatric profession that proper use of the drugs is one of the most effective means of treating and controlling a mental illness likely to cause violent behavior.[9]

The alternative means proffered by respondent for accommodating his interest in rejecting the forced administration of antipsychotic drugs do not demonstrate the invalidity of the State's policy. Respondent's main contention is that, as a precondition to antipsychotic drug treatment, the State must find him incompetent, and then obtain court approval of the treatment using a "substituted judgment" standard. The suggested rule takes no account of the legitimate governmental interest in treating him where medically appropriate for the purpose of reducing the danger he poses. A rule that is in no way responsive to the State's legitimate interests is not a proper accommodation, and can be rejected out of hand. Nor are physical restraints or seclusion "alternative[s] that fully accommodat[e] the prisoner's rights at de minimis cost to valid penological interests." Turner, supra, at 91. Physical restraints are effective only in the short term, and can have serious physical side effects when used on a resist-

---

[9] See Brief for American Psychiatric Association et al. as Amici Curiae 10–11 ("Psychotropic medication is widely accepted within the psychiatric community as an extraordinarily effective treatment for both acute and chronic psychoses, particularly schizophrenia"); Brief for American Psychological Association as Amicus Curiae 6.

ing inmate, see Brief for American Psychiatric Association et al. as *Amici Curiae* 12, as well as leaving the staff at risk of injury while putting the restraints on or tending to the inmate who is in them. Furthermore, respondent has failed to demonstrate that physical restraints or seclusion are acceptable substitutes for antipsychotic drugs, in terms of either their medical effectiveness or their toll on limited prison resources.[10]

We hold that, given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest. Policy 600.30 comports with these requirements; we therefore reject respondent's contention that its substantive standards are deficient under the Constitution.[11]

---

[10] There is substantial evidence to the contrary. See Brief for American Psychiatric Association et al. as *Amici Curiae* 11–12; Soloff, Physical Controls: The Use of Seclusion and Restraint in Modern Psychiatric Practice, in Clinical Treatment of the Violent Person 119–137 (L. Roth ed. 1987) (documenting the risks and costs of using physical restraints and seclusion on violent patients).

[11] Perhaps suggesting that the care given to respondent and the Center's utilization of Policy 600.30 may have been suspect, JUSTICE STEVENS uses random citations from exhibits and documents submitted to the state trial court. By using isolated quotations of a few passages from medical and other records running into the hundreds of pages, JUSTICE STEVENS risks presenting a rather one-sided portrait of what they contain. An overview of these extensive materials reveals that respondent has a long history of serious, assaultive behavior, evidenced by at least 20 reported incidents of serious assaults on fellow inmates and staff. Respondent's doctors attributed these incidents to his severe mental illness and believed that his assaultive tendencies increased when he did not receive medication. See App. to Pet. for Cert. B–5. Respondent's opposition to the involuntary administration of antipsychotic drugs was premised at least in part upon his desire to self-medicate with street drugs, especially cocaine. See Lodging filed by Kenneth O. Eikenberry, Attorney General of Washington, Book 3, July 25, 1984, Progress Report. Finally, the records show without doubt that respondent has been the recipient of painstaking medical

## IV

Having determined that state law recognizes a liberty interest, also protected by the Due Process Clause, which permits refusal of antipsychotic drugs unless certain preconditions are met, we address next what procedural protections are necessary to ensure that the decision to medicate an inmate against his will is neither arbitrary nor erroneous under the standards we have discussed above. The Washington Supreme Court held that a full judicial hearing, with the inmate being represented by counsel, was required by the Due Process Clause before the State could administer antipsychotic drugs to him against his will. In addition, the court held that the State must justify the authorization of involuntary administration of antipsychotic drugs by "clear, cogent, and convincing" evidence. We hold that the administrative hearing procedures set by the SOC Policy do comport with procedural due process, and conclude that the Washington Supreme Court erred in requiring a judicial hearing as a prerequisite for the involuntary treatment of prison inmates.

## A

The primary point of disagreement between the parties is whether due process requires a judicial decisionmaker. As

diagnosis and care while at the SOC. In any event, the trial court did not indicate which portions, if any, of these records, all of which are hearsay, it credited or relied upon in making its findings.

For these reasons, we do not intend to engage in a debate with JUSTICE STEVENS over how respondent's medical and institutional records should be interpreted. We rely upon the findings of the trial court that "at all times relevant to this action, [respondent] suffered from a mental disorder and as a result of that disorder constituted a likelihood of serious harm to others," App. to Pet. for Cert. B–8, and that "the medical treatment provided to [respondent] by defendants, including the administration of anti-psychotic medications, was consistent with the degree of care, skill, and learning expected of a reasonably prudent psychiatrist in the State of Washington, acting in the same or similar circumstances." Ibid. Contrary to JUSTICE STEVENS' cramped reading of this last finding, see post, at 245, n. 13, the breadth of its meaning equals the breadth of its language.

written, the Policy requires that the decision whether to medicate an inmate against his will be made by a hearing committee composed of a psychiatrist, a psychologist, and the Center's Associate Superintendent. None of the committee members may be involved, at the time of the hearing, in the inmate's treatment or diagnosis; members are not disqualified from sitting on the committee, however, if they have treated or diagnosed the inmate in the past. The committee's decision is subject to review by the Superintendent; if the inmate so desires, he may seek judicial review of the decision in a state court. See *supra*, at 216. Respondent contends that only a court should make the decision to medicate an inmate against his will.

The procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case. *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972); *Hewitt*, 459 U. S., at 472; *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 12 (1979). The factors that guide us are well established. "Under *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976), we consider the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment." *Hewitt, supra,* at 473.

Respondent's interest in avoiding the unwarranted administration of antipsychotic drugs is not insubstantial. The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. Cf. *Winston* v. *Lee*, 470 U. S. 753 (1985); *Schmerber* v. *California*, 384 U. S. 757, 772 (1966). The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. See n. 1, *supra*. While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects. One such side effect identified by the trial court is acute dystonia, a severe involuntary spasm of the upper

body, tongue, throat, or eyes. The trial court found that it may be treated and reversed within a few minutes through use of the medication Cogentin. Other side effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, perhaps the most discussed side effect of antipsychotic drugs. See Finding of Fact 9, App. to Pet. for Cert. B–7; Brief for American Psychological Association as *Amicus Curiae* 6–9. Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face. See *Mills*, 457 U. S., at 293, n. 1. The State, respondent, and *amici* sharply disagree about the frequency with which tardive dyskinesia occurs, its severity, and the medical profession's ability to treat, arrest, or reverse the condition. A fair reading of the evidence, however, suggests that the proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%. According to the American Psychiatric Association, studies of the condition indicate that 60% of tardive dyskinesia is mild or minimal in effect, and about 10% may be characterized as severe. Brief for American Psychiatric Association et al. as *Amici Curiae* 14–16, and n. 12; see also Brief for American Psychological Association as *Amicus Curiae* 8.[12]

---

[12] JUSTICE STEVENS is concerned with "discount[ing] the severity of these drugs." See *post*, at 239, n. 5. As our discussion in the text indicates, we are well aware of the side effects and risks presented by these drugs; we also are well aware of the disagreements in the medical profession over the frequency, severity, and permanence of these side effects. We have set forth a fair assessment of the current state of medical knowledge about these drugs.

What JUSTICE STEVENS "discount[s]" are the benefits of these drugs, and the deference that is owed to medical professionals who have the full-

Notwithstanding the risks that are involved, we conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge. The Due Process Clause "has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer." *Parham*, 442 U. S., at 607. Though it cannot be doubted that the decision to medicate has societal and legal implications, the Constitution does not prohibit the State from permitting medical personnel to make the decision under fair procedural mechanisms. See *id.*, at 607–609; cf. *Youngberg*, 457 U. S., at 322–323. Particularly where the patient is mentally disturbed, his own intentions will be difficult to assess and will be changeable in any event. Schwartz, Vingiano, & Perez, Autonomy and the Right to Refuse Treatment: Patients' Attitudes After Involuntary Medication, 39 Hospital & Community Psychiatry 1049 (1988). Respondent's own history of accepting and then refusing drug treatment illustrates the point. We cannot make the facile assumption that the patient's intentions, or a substituted judgment approximating those intentions, can be determined in a single judicial hearing apart from the reali-

time responsibility of caring for mentally ill inmates like respondent and who possess, as courts do not, the requisite knowledge and expertise to determine whether the drugs should be used in an individual case. After admitting that the proper administration of antipsychotic drugs is one of the most effective means of treating certain mental illnesses, JUSTICE STEVENS contends that the drugs are not indicated for "all patients," and then questions the appropriateness of the treatment provided to respondent. See *post*, at 248, n. 16. All concede that the drugs are not the approved treatment in all cases. As for whether respondent's medical treatment was appropriate, we are not so sanguine as to believe that on the basis of the limited record before us, we have the medical expertise and knowledge necessary to determine whether, on the basis of isolated parts of respondent's medical records, the care given to him is consistent with good medical practice. Again, we must defer to the finding of the trial court, unchallenged by any party in this case, that the medical care provided to respondent was appropriate under medical standards. See n. 11, *supra*.

ties of frequent and ongoing clinical observation by medical professionals. Our holding in *Parham* that a judicial hearing was not required prior to the voluntary commitment of a child to a mental hospital was based on similar observations:

"... [D]ue process is not violated by use of informal, traditional medical investigative techniques. . . . The mode and procedure of medical diagnostic procedures is not the business of judges. . . .

.     .     .     .     .

"Although we acknowledge the fallibility of medical and psychiatric diagnosis, see *O'Connor* v. *Donaldson*, 422 U. S. 563, 584 (1975) (concurring opinion), we do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer after a judicial-type hearing. Even after a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real." *Parham*, 442 U. S., at 607–609.

Nor can we ignore the fact that requiring judicial hearings will divert scarce prison resources, both money and the staff's time, from the care and treatment of mentally ill inmates. See *id.*, at 605–606.

Under Policy 600.30, the decisionmaker is asked to review a medical treatment decision made by a medical professional. That review requires two medical inquiries: first, whether the inmate suffers from a "mental disorder"; and second, whether, as a result of that disorder, he is dangerous to himself, others, or their property. Under the Policy, the hear-

ing committee reviews on a regular basis the staff's choice of both the type and dosage of drug to be administered, and can order appropriate changes. 110 Wash. 2d, at 875, 759 P. 2d, at 360. The risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals. A State may conclude with good reason that a judicial hearing will not be as effective, as continuous, or as probing as administrative review using medical decisionmakers. We hold that due process requires no more.

A State's attempt to set a high standard for determining when involuntary medication with antipsychotic drugs is permitted cannot withstand challenge if there are no procedural safeguards to ensure the prisoner's interests are taken into account. Adequate procedures exist here. In particular, independence of the decisionmaker is addressed to our satisfaction by these procedures. None of the hearing committee members may be involved in the inmate's current treatment or diagnosis. The record before us, moreover, is limited to the hearings given to respondent. There is no indication that any institutional biases affected or altered the decision to medicate respondent against his will. The trial court made specific findings that respondent has a history of assaultive behavior which his doctors attribute to his mental disease, and that all of the Policy's requirements were met. See App. to Pet. for Cert. B–4 to B–5, B–8. The court found also that the medical treatment provided to respondent, including the administration of antipsychotic drugs, was at all times consistent "with the degree of care, skill, and learning expected of a reasonably prudent psychiatrist in the State of Washington, acting in the same or similar circumstances." Id., at B–8. In the absence of record evidence to the contrary, we are not willing to presume that members of the staff lack the necessary independence to provide an inmate with a full and fair hearing in accordance with the Policy. In previous cases involving medical decisions implicating similar

liberty interests, we have approved use of similar internal decisionmakers. See *Vitek*, 445 U. S., at 496; *Parham*, *supra*, at 613–616.[13] Cf. *Wolff*, 418 U. S., at 570–571 (prison

---

[13] In an attempt to prove that internal decisionmakers lack the independence necessary to render impartial decisions, respondent and various *amici* refer us to other cases in which it is alleged that antipsychotic drugs were prescribed not for medical purposes, but to control or discipline mentally ill patients. See Brief for Respondent 28; Brief for American Psychological Association as *Amicus Curiae* 14. We rejected a similar claim in *Parham*, and do so again here, using much the same reasoning. "That such a practice may take place in some institutions in some places affords no basis for a finding as to [Washington's] program," *Parham*, 442 U. S., at 616, particularly in light of the trial court's finding here that the administration of antipsychotic drugs to respondent was consistent with good medical practice.

Moreover, the practical effect of mandating an outside decisionmaker such as an "independent psychiatrist" or judge in these circumstances may be chimerical. Review of the literature indicates that outside decisionmakers concur with the treating physician's decision to treat a patient involuntarily in most, if not all, cases. See Bloom, Faulkner, Holm, & Rawlinson, An Empirical View of Patients Exercising Their Right to Refuse Treatment, 7 Int'l J. Law & Psychiatry 315, 325 (1984) (independent examining physician used in Oregon psychiatric hospital concurred in decision to involuntarily medicate patients in 95% of cases); Hickman, Resnick, & Olson, Right to Refuse Psychotropic Medication: An Interdisciplinary Proposal, 6 Mental Disability Law Reporter 122, 130 (1982) (independent reviewing psychiatrist used in Ohio affirmed the recommendation of internal reviewer in 100% of cases). Review by judges of decisions to override a patient's objections to medication yields similar results. Appelbaum, The Right to Refuse Treatment With Antipsychotic Medications: Retrospect and Prospect, 145 Am. J. Psychiatry 413, 417–418 (1988). In comparison, other studies reveal that review by internal decisionmakers is hardly as lackluster as JUSTICE STEVENS suggests. See Hickman, Resnick, & Olson, *supra*, at 130 (internal reviewer approved of involuntary treatment in 75% of cases); Zito, Lentz, Routt, & Olson, The Treatment Review Panel: A Solution to Treatment Refusal?, 12 Bull. American Academy of Psychiatry and Law 349 (1984) (internal review panel used in Minnesota mental hospital approved of involuntary medication in 67% of cases). See generally Appelbaum & Hoge, The Right to Refuse Treatment: What the Research Reveals, 4 Behavioral Sciences and Law 279, 288–290 (1986) (summarizing results of studies on how various institutions review patients' decisions to refuse antipsychotic medications and noting "the infre-

officials sufficiently impartial to conduct prison disciplinary hearings). As we reasoned in *Vitek*, it is only by permitting persons connected with the institution to make these decisions that courts are able to avoid "unnecessary intrusion into either medical or correctional judgments." *Vitek, supra,* at 496; see *Turner,* 482 U. S., at 84–85, 89.

## B

The procedures established by the Center are sufficient to meet the requirements of due process in all other respects, and we reject respondent's arguments to the contrary. The Policy provides for notice, the right to be present at an adversary hearing, and the right to present and cross-examine witnesses. See *Vitek, supra,* at 494–496. The procedural protections are not vitiated by meetings between the committee members and staff before the hearing. Absent evidence of resulting bias, or evidence that the actual decision is made before the hearing, allowing respondent to contest the staff's position at the hearing satisfies the requirement that the opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965). We reject also respondent's contention that the hearing must be conducted in accordance with the rules of evidence or that a "clear, cogent, and convincing" standard of proof is necessary. This standard is neither required nor helpful when medical personnel are making the judgment required by the regulations here. See *Vitek, supra,* at 494–495. Cf. *Youngberg,* 457 U. S., at 321–323. Finally, we note that under state law an inmate may obtain judicial review of the hearing committee's decision by way of a personal restraint petition or petition for an extraordinary writ, and that the trial court found that the record compiled under the Policy was adequate to allow such review. See App. to Pet. for Cert. B–8.

---

quency with which refusals are allowed, regardless of the system or the decisionmaker").

Respondent contends that the Policy is nonetheless deficient because it does not allow him to be represented by counsel. We disagree. "[I]t is less than crystal clear why *lawyers* must be available to identify possible errors in *medical* judgment." *Walters* v. *National Association of Radiation Survivors*, 473 U. S. 305, 330 (1985) (emphasis in original). Given the nature of the decision to be made, we conclude that the provision of an independent lay adviser who understands the psychiatric issues involved is sufficient protection. See *Vitek*, *supra*, at 499–500 (Powell, J., concurring).

V

In sum, we hold that the regulation before us is permissible under the Constitution. It is an accommodation between an inmate's liberty interest in avoiding the forced administration of antipsychotic drugs and the State's interests in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others. The Due Process Clause does require certain essential procedural protections, all of which are provided by the regulation before us. The judgment of the Washington Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring.

I join the Court's opinion. The difficult and controversial character of this case is illustrated by the simple fact that the American Psychiatric Association and the American Psychological Association, which are respected, knowledgeable, and informed professional organizations, and which are here as *amici curiae*, pull the Court in opposite directions.

I add a caveat. Much of the difficulty will be lessened if, in any appropriate case, the mentally ill patient is formally committed. This on occasion may seem to be a bother or a nuisance, but it is a move that would be protective for all

concerned, the inmate, the institution, its staff, the physician, and the State itself. Cf. *Zinermon* v. *Burch, ante,* p. 113. It is a step that should not be avoided or neglected when significant indications of incompetency are present.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and dissenting in part.

While I join the Court's explanation of why this case is not moot, I disagree with its evaluation of the merits. The Court has undervalued respondent's liberty interest; has misread the Washington involuntary medication Policy and misapplied our decision in *Turner* v. *Safley,* 482 U. S. 78 (1987); and has concluded that a mock trial before an institutionally biased tribunal constitutes "due process of law." Each of these errors merits separate discussion.

## I

The Court acknowledges that under the Fourteenth Amendment "respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs," *ante,* at 221, but then virtually ignores the several dimensions of that liberty. They are both physical and intellectual. Every violation of a person's bodily integrity is an invasion of his or her liberty. The invasion is particularly intrusive if it creates a substantial risk of permanent injury and premature death.[1] Moreover, any such action is degrading if it overrides a competent person's choice to reject a specific form of medical treatment.[2] And when the purpose

---

[1] Cf., *e. g., Winston* v. *Lee,* 470 U. S. 753 (1985) (surgery); *Youngberg* v. *Romeo,* 457 U. S. 307 (1982) (use of physical "soft" restraints for the arms and "muffs" for hands).

[2] See *Mills* v. *Rogers,* 457 U. S. 291, 294, n. 4, 299, n. 16 (1982) (recognizing common-law battery for unauthorized touchings by a physician and assuming liberty interests are implicated by involuntary administration of psychotropic drugs); *United States* v. *Stanley,* 483 U. S. 669, 710 (1987) (O'CONNOR, J., concurring in part and dissenting in part) (the Constitution's promise of due process of law guarantees at least compensation

or effect of forced drugging is to alter the will and the mind of the subject, it constitutes a deprivation of liberty in the most literal and fundamental sense.

> "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting).

The liberty of citizens to resist the administration of mind altering drugs arises from our Nation's most basic values.[3]

---

for violations of the principle stated by the Nuremberg Military Tribunals "that the 'voluntary consent of the human subject is absolutely essential . . . to satisfy moral, ethical and legal concepts'"); *Doe* v. *Bolton*, 410 U. S. 179, 213 (1973) (Douglas, J., concurring) (the Fourteenth Amendment protects the "freedom to care for one's health and person" (emphasis deleted)). Harper was not adjudged insane or incompetent. 110 Wash. 2d 873, 882, 759 P. 2d 358, 364 (1988).

[3] See also *Stanley* v. *Georgia*, 394 U. S. 557, 565 (1969) ("Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds").

"It is obligatory that Helsinki signatory states not manipulate the minds of their citizens; that they not step between a man and his conscience or his God; and that they not prevent his thoughts from finding expression through peaceful action. We are all painfully aware, furthermore, that governments which systematically disregard the rights of their own people are not likely to respect the rights of other nations and other people." Hearings on Abuse of Psychiatry in the Soviet Union before the Subcommittee on Human Rights and International Organizations of the House Committee on Foreign Affairs, 98th Cong., 1st Sess., 106 (1983) (Remarks by Max Kampelman, Chair of the U. S. Delegation, to the Plenary Session of the Commission on Security and Cooperation in Europe).

The record of one of Walter Harper's involuntary medication hearings at the Special Offense Center (SOC) notes: "Inmate Harper stated he would rather die th[a]n take medication."[4] That Harper would be so opposed to taking psychotropic drugs is not surprising: as the Court acknowledges, these drugs both "alter the chemical balance in a patient's brain" and can cause irreversible and fatal side effects.[5]

---

[4] Lodging filed by Kenneth O. Eikenberry, Attorney General of Washington (hereinafter Lodging), Book 8, Jan. 5, 1984, Hearing (Harper testified: "Well all you want to do is medicate me and you've been medicating me. . . . Haldol paral[y]zed my right side of my body. . . . [Y]ou are burning me out of my life . . . [Y]ou are burning me out of my freedom").

The Lodging includes "books" of discovery material that the parties stipulated "could be considered by the [Trial] Court as substantive evidence and the [Trial] Court . . . considered those documents." App. to Pet. for Cert. B-1. They are hereinafter referred to by Book number and the date of the entry, where applicable. I use the Lodging not to "engage in a debate" over the assessment of Harper's treatment, *ante,* at 228, n. 11, but simply to illustrate the boundaries of Policy 600.30 in operation.

[5] *Ante,* at 229. The Court relies heavily on the Brief for American Psychiatric Association et al. as *Amici Curiae* (Psychiatrists' Brief), see *ante,* at 214, 226, and n. 9, 227, and n. 10, 230, to discount the severity of these drugs. However, medical findings discussed in other briefs support the conclusions of the Washington Supreme Court and challenge the reliability of the Psychiatrists' Brief. For example, the Brief for American Psychological Association as *Amicus Curiae* (Psychologists' Brief) points out that the observation of tardive dyskinesia has been increasing "at an alarming rate" since the 1950–1970 data relied on by the Psychiatrists' Brief 14–16, and that "the chance of suffering this potentially devastating disorder is greater than one in four." Psychologists' Brief 8. See also Brief for Coalition for Fundamental Rights and Equality of Ex-Patients as *Amicus Curiae* 16–18 (court findings and recent literature on side effects); Brief for National Association of Protection and Advocacy Systems et al. as *Amici Curiae* 7–16 (same). Psychiatrists also may not be entirely disinterested experts. The psychologists charge: "As a psychiatrist has written, '[l]itigation from patients suffering from TD [tardive dyskinesia] is expected to explode within the next five years. Some psychiatrists and other physicians continue to minimize the seriousness of TD . . . [despite] continual warnings.'" Psychologists' Brief 4 (quoting R. Simon, Clinical Psychiatry and the Law 74 (1987)).

The prolixin injections that Harper was receiving at the time of his statement exemplify the intrusiveness of psychotropic drugs on a person's body and mind. Prolixin acts "at all levels of the central nervous system as well as on multiple organ systems."[6] It can induce catatonic-like states, alter electroencephalographic tracings, and cause swelling of the brain. Adverse reactions include drowsiness, excitement, restlessness, bizarre dreams, hypertension, nausea, vomiting, loss of appetite, salivation, dry mouth, perspiration, headache, constipation, blurred vision, impotency, eczema, jaundice, tremors, and muscle spasms. As with all psychotropic drugs, prolixin may cause tardive dyskinesia, an often irreversible syndrome of uncontrollable movements that can prevent a person from exercising basic functions such as driving an automobile, and neuroleptic malignant syndrome, which is 30% fatal for those who suffer from it.[7] The risk of side effects increases over time.[8]

The Washington Supreme Court properly equated the intrusiveness of this mind-altering drug treatment with electroconvulsive therapy or psychosurgery. It agreed with the Supreme Judicial Court of Massachusetts' determination that the drugs have a "'profound effect'" on a person's "'thought

---

[6] Physician's Desk Reference 1639 (43d ed. 1989).

[7] Id., at 1640; Trial Court Finding 9, App. to Pet. for Cert. B–7 to B–8; Guzé & Baxter, Neuroleptic Malignant Syndrome, 313 New England J. Med. 163, 163–164 (1985).

[8] Physician's Desk Reference, supra, at 1639. Harper voluntarily took psychotropic drugs for six years before involuntary medication began in 1982, by which time he had already exhibited dystonia (acute muscle spasms) and akathesia (physical-emotional agitation). E. g., Lodging, Book 2, May 28, 1982, Aug. 4, 1982; see also Trial Court Findings 9–10, App. to Pet. for Cert. B–7 to B–8. Although avoidance of akathesia and the risk of tardive dyskinesia require reduction or discontinuance of psychotropics, ibid., Harper's involuntary medication was continuous from November 1982 to June 1986, except for one month spent at Washington State Reformatory. Lodging, Book 8; Trial Court Findings 4–6, 9, App. to Pet. for Cert. B–4 to B–8.

processes'" and a "'well-established likelihood of severe and irreversible adverse side effects,'" and that they therefore should be treated "'in the same manner we would treat psychosurgery or electroconvulsive therapy.'" 110 Wash. 2d 873, 878, 759 P. 2d 358, 362 (1988) (quoting *In re Guardianship of Roe*, 383 Mass. 415, 436–437, 421 N. E. 2d 40, 53 (1981)). There is no doubt, as the State Supreme Court and other courts that have analyzed the issue have concluded, that a competent individual's right to refuse such medication is a fundamental liberty interest deserving the highest order of protection.[9]

## II

Arguably, any of three quite different state interests might be advanced to justify a deprivation of this liberty interest. The State might seek to compel Harper to submit to a mind-altering drug treatment program as punishment for the crime he committed in 1976, as a "cure" for his mental illness, or as a mechanism to maintain order in the prison. The Court today recognizes Harper's liberty interest only as against the first justification.

Forced administration of antipsychotic medication may not be used as a form of punishment. This conclusion follows inexorably from our holding in *Vitek* v. *Jones*, 445 U. S. 480 (1980), that the Constitution provides a convicted felon the protection of due process against an involuntary transfer from the prison population to a mental hospital for psychiatric treatment. We explained:

---

[9] 110 Wash. 2d, at 878, 759 P. 2d, at 362. See, *e. g., Large* v. *Superior Court*, 148 Ariz. 229, 714 P. 2d 399 (1986) (en banc); *Riese* v. *St. Mary's Hospital and Medical Center*, 209 Cal. App. 3d 1303, 243 Cal. Rptr. 241 (1st Dist. 1988), review granted but dism'd, 774 P. 2d 698 (1989); *People* v. *Medina*, 705 P. 2d 961 (Colo. 1985) (en banc); *Rogers* v. *Commissioner of Dept. of Mental Health*, 390 Mass. 489, 458 N. E. 2d 308 (1983); *Rivers* v. *Katz*, 67 N. Y. 2d 485, 495 N. E. 2d 337 (1986); *In re Mental Health of K. K. B.*, 609 P. 2d 747 (Okla. 1980). Cf. *In re Schuoler*, 106 Wash. 2d 500, 723 P. 2d 1103 (1986) (right to refuse electroconvulsive therapy).

"Appellants maintain that the transfer of a prisoner to a mental hospital is within the range of confinement justified by imposition of a prison sentence, at least after certification by a qualified person that a prisoner suffers from a mental disease or defect. We cannot agree. None of our decisions holds that conviction for a crime entitles a State not only to confine the convicted person but also to determine that he has a mental illness and to subject him involuntarily to institutional care in a mental hospital. Such consequences visited on the prisoner are qualitatively different from the punishment characteristically suffered by a person convicted of crime. Our cases recognize as much and reflect an understanding that involuntary commitment to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual. *Baxstrom* v. *Herold*, 383 U. S. 107 (1966); *Specht* v. *Patterson*, 386 U. S. 605 (1967); *Humphrey* v. *Cady*, 405 U. S. 504 (1972); *Jackson* v. *Indiana*, 406 U. S. 715, 724–725 (1972). A criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from confinement for the term of his sentence, but they do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment without affording him additional due process protections." *Id.*, at 493–494.

The Court does not suggest that psychotropic drugs, any more than transfer for medical treatment, may be forced on prisoners as a necesssary condition of their incarceration or as a disciplinary measure. Rather, it holds:

"[G]iven the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others *and the treatment is in the inmate's medical interest.* Policy 600.30 comports with

these requirements; we therefore reject respondent's contention that its substantive standards are deficient under the Constitution." *Ante*, at 227 (emphasis added).

Crucial to the Court's exposition of this substantive due process standard is the condition that these drugs "may be administered for no purpose other than treatment," and that "the treatment in question will be ordered only if it is in the prisoner's medical interests, given the legitimate needs of his institutional confinement." *Ante*, at 226, 222. Thus, although the Court does not find, as Harper urges, an absolute liberty interest of a competent person to refuse psychotropic drugs, it does recognize that the substantive protections of the Due Process Clause limit the forced administration of psychotropic drugs to all but those inmates whose medical interests would be advanced by such treatment.

Under this standard the Court upholds SOC Policy 600.30, determining that this administrative scheme confers, as a matter of state law, a substantive liberty interest coextensive with that conferred by the Due Process Clause. *Ante*, at 221–222, 227. Whether or not the State's alleged interest in providing medically beneficial treatment to those in its custody who are mentally ill may alone override the refusal of psychotropic drugs by a presumptively competent person, a plain reading of Policy 600.30 reveals that it does not meet the substantive standard set forth by the Court. Even on the Court's terms, the Policy is constitutionally insufficient.

Policy 600.30 permits forced administration of psychotropic drugs on a mentally ill inmate based purely on the impact that his disorder has on the security of the prison environment. The provisions of the Policy make no reference to any expected benefit to the inmate's medical condition. Policy 600.30 requires:

"In order for involuntary medication to be approved, it must be demonstrated that the inmate suffers from a mental disorder and as a result of that disorder constitutes a likelihood of serious harm to himself or others

and/or is gravely disabled." Lodging, Book 9, Policy 600.30, p. 1.

"Likelihood of serious harm," according to the Policy,

> "means either (i) A substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (ii) a substantial risk that physical harm will be inflicted by an individual upon another as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, or (iii) a substantial risk that physical harm will be inflicted by an individual upon the property of others as evidenced by behavior which has caused substantial loss or damage to the property of others." [10]

Thus, the Policy authorizes long-term involuntary medication not only of any mentally ill inmate who, as a result of a mental disorder, appears to present a future risk to himself, but also of an inmate who presents a future risk to other people or mere property.

Although any application of Policy 600.30 requires a medical judgment as to a prisoner's mental condition and the cause of his behavior, the Policy does not require a determination that forced medication would advance his medical interest.[11] Use of psychotropic drugs, the State readily admits,

---

[10] Lodging, Book 9, Policy 600.30, p. 1. Revised Policy 620.200, effective February 18, 1985, retained these substantive definitions. Lodging, Book 9, Policy 620.200, p. 1.

[11] The Court's reliance on the Hippocratic Oath to save the constitutionality of Policy 600.30 is unavailing. *Ante*, at 223, n. 8. Whether or not the Oath binds treating physicians with a "medical interest" requirement in prescribing medications, it has no bearing on the SOC review committees, which are governed solely by the administrative criteria of Policy 600.30 in authorizing involuntary medication. Nor can the Court possibly believe that any "treatment" is talismanically in a patient's "medical interest." Treatment of a condition with medication facilitates a specific physiological result, which may or may not be in the overall medical interest of the patient. For example, the patient's medical interest in reducing his own vio-

serves to ease the institutional and administrative burdens of maintaining prison security and provides a means of managing an unruly prison population and preventing property damage.[12]   By focusing on the risk that the inmate's mental condition poses to other people and property, the Policy allows the State to exercise either *parens patriae* authority or police authority to override a prisoner's liberty interest in refusing psychotropic drugs.   Thus, most unfortunately, there is simply no basis for the Court's assertion that medication under the Policy must be to advance the prisoner's medical interest.[13]

Policy 600.30 sweepingly sacrifices the inmate's substantive liberty interest to refuse psychotropic drugs, regardless of his medical interests, to institutional and administrative

---

lence or in altering his mental condition may be often outweighed by the risk or onset of severe medical side effects.   See *supra*, at 239–241.   Finally, the qualitative judgment of what is a patient's best interest cannot be made without reference to his own preferences.   The Policy does not account for either a physician's determination of medical interest or the inmate's wishes.

[12] See, *e. g.*, Brief for Petitioners 29 ("Harper's history of assaultive behavior requires that the state exercise its police power to appropriately medicate him for the protection of others"); *id.*, at 17 ("The policy assists prison administrators in meeting their 'unquestioned duty to provide reasonable safety for all residents and personnel within the institution'"). See also Brief for United States as *Amicus Curiae* 17 ("The paramount concerns in running a prison or a prison mental health facility are maintaining institutional security, preserving internal order, and establishing a therapeutic environment. . . . [I]t goes without saying that the interest in preventing violence and maintaining order is significantly amplified when an entire ward consists of mentally ill prisoners, as at the SOC").

[13] The trial court did not attempt to separate the medical and institutional objectives of Policy 600.30.   Nor did it construe the Policy's terms to require that an inmate's best medical interests be served by medication.   The trial court's findings were limited to Harper's case.   Findings 11–12, App. to Pet. for Cert. B–8.   They shed no light on whether Harper's doctors did—or "a reasonably prudent psychiatrist in the State of Washington, acting in the same or similar circumstances" as a SOC psychiatrist could—order medication for any combination of therapeutic or institutional concerns.   Finding 12, App. to Pet. for Cert. B–8.

concerns. The State clearly has a legitimate interest in prison security and administrative convenience that encompasses responding to potential risks to persons and property. However, to the extent that the Court recognizes "both the prisoner's medical interests and the State's interests" as potentially *independent* justifications for involuntary medication of inmates,[14] it seriously misapplies the standard announced in *Turner* v. *Safley*, 482 U. S. 78 (1987). In *Turner*, we held that a prison regulation that impinges on inmates' constitutional rights is valid "if it is reasonably related to legitimate penological interests." *Id.*, at 89. Under this test, we determined that a regulation barring inmate-to-inmate correspondence was adequately supported by the State's institutional security concerns. *Id.*, at 93. We also unanimously concluded that a regulation prohibiting inmate marriage, except with consent of the prison superintendent made upon proof of compelling circumstances, was an "exaggerated response" to the prison's claimed security objectives and was not reasonably related to its articulated rehabilitation goal. *Id.*, at 97–98.

The State advances security concerns as a justification for forced medication in two distinct circumstances. A SOC Policy provision not at issue in this case permits 72 hours of involuntary medication on an emergency basis when "an inmate is suffering from a mental disorder and as a result of that disorder presents an *imminent* likelihood of *serious harm* to himself or others." Lodging, Book 9, Policy 600.30, p. 2 (emphasis added). In contrast to the imminent danger of injury that triggers the emergency medication provisions, a general risk of illness-induced injury or property damage— evidenced by no more than past behavior—allows long-term, involuntary medication of an inmate with psychotropic drugs

---

[14] *Ante*, at 223. The Court further conflates its analysis by suggesting that "[t]he State has undertaken the obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution." *Ante*, at 225.

under Policy 600.30. This ongoing interest in security and management is a penological concern of a constitutionally distinct magnitude from the necessity of responding to emergencies. See *Whitley* v. *Albers,* 475 U. S. 312, 321–322 (1986). It is difficult to imagine what, if any, limits would restrain such a general concern of prison administrators who believe that prison environments are, "'by definition,' . . . made up of persons with 'a demonstrated proclivity for antisocial criminal, and often violent, conduct.'" *Ante,* at 225 (quoting *Hudson* v. *Palmer,* 468 U. S. 517, 526 (1984)). A rule that allows prison administrators to address potential security risks by forcing psychotropic drugs on mentally ill inmates for prolonged periods is unquestionably an "exaggerated response" to that concern.

In *Turner* we concluded on the record before us that the marriage "regulation, as written, [was] not reasonably related to . . . penological interests," and that there were "obvious, easy alternatives" that the State failed to rebut by reference to the record. 482 U. S., at 97–98. Today the Court concludes that alternatives to psychotropic drugs would impose more than *de minimis* costs on the State. However, the record before us does not establish that a more narrowly drawn policy withdrawing psychotropics from only those inmates who actually refuse consent[15] and who do not pose

---

[15] There is no evidence that more than a small fraction of inmates would refuse drugs under a voluntary policy. Harper himself voluntarily took psychotropics for six years, and intermittently consented to them after 1982. Lodging, Books 2 and 8. See, *e. g., Rogers* v. *Okin,* 478 F. Supp. 1342, 1369 (Mass. 1979) (only 12 of 1,000 institutionalized patients refused psychotropic drugs for prolonged periods during the two years that judicial restraining order was in effect), modified, 634 F. 2d 650 (CA1 1980), vacated and remanded *sub nom. Mills* v. *Rogers,* 457 U. S. 291 (1982). The efficacy of forced drugging is also marginal; involuntary patients have a poorer prognosis than cooperative patients. See Rogers & Webster, Assessing Treatability in Mentally Disordered Offenders, 13 Law and Human Behavior 19, 20–21 (1989).

an imminent threat of serious harm [16] would increase the marginal costs of SOC administration. Harper's own record reveals that administrative segregation and standard disciplinary sanctions were frequently imposed on him over and above forced medication and thus would add no new costs. Lodging, Book 1. Similarly, intramuscular injections of psychotropics, such as those frequently forced on Harper, *id.*, Book 7, entail no greater risk than administration of less dangerous drugs such as tranquilizers. [17] Use of psychotro-

---

[16] As the Court notes, properly used, these drugs are "one of the most effective means of treating and controlling" certain incurable mental illnesses, *ante*, at 226, but they are not a panacea for long-term care of all patients.

"[T]he maintenance treatment literature . . . shows that many patients (approximately 30%) relapse despite receiving neuroleptic medication, while neuroleptics can be withdrawn from other patients for many months and in some cases for years without relapse. Standard maintenance medication treatment strategies, though they are indisputably effective in group comparisons, may be quite inefficient in addressing the treatment requirements of the individual patient." Lieberman et al., Reply to Ethics of Drug Discontinuation Studies in Schizophrenia, 46 Archives of General Psychiatry 387 (1989) (footnotes omitted).

Indeed, the drugs appear to have produced at most minor "savings" in Harper's case. Dr. Petrich reported that "medications are not satisfactory in containing the worst excesses of his labile and irritable behavior. He is uncooperative when on medication," Lodging, Book 2, Nov. 10, 1982, and a therapy supervisor reported before Harper's involuntary medication began:

"[D]uring the time in which he assaulted the nurse at Cabrini he was on neuroleptic medication yet there is indication that he was psychotic. However, during his stay at SOC he has been off of all neuroleptic medications and at times has shown some preoccupation and appearance of psychosis but has not become assaultive. His problems on medication, such as the paradoxical effect from the neuroleptic medications, may be precipitated by increased doses of neuroleptic medications and may cause an exacerbation of his psychosis. Though Mr. Harper is focused on psychosomatic problems from neuroleptic medications as per the side effects, the real problem may be that the psychosis is exacerbated by neuroleptic medications." *Id.*, Book 3, May 6, 1982, p. 6.

[17] Because most psychotropic drugs do induce lethargy, drowsiness, and fatigue, *e. g.*, Physician's Desk Reference 1126, 1236, 1640, 1755, 1788,

pic drugs simply to suppress an inmate's potential violence, rather than to achieve therapeutic results, may also undermine the efficacy of other available treatment programs that would better address his illness.[18]

The Court's careful differentiation in *Turner* between the State's articulated goals of security and rehabilitation should be emulated in this case. The flaw in Washington's Policy 600.30—and the basic error in the Court's opinion today—is the failure to divorce from each other the two justifications for forced medication and to consider the extent to which the Policy is reasonably related to either interest. The State, and arguably the Court, allows the SOC to blend the state interests in responding to emergencies and in convenient prison administration with the individual's interest in receiving beneficial medical treatment. The result is a muddled rationale that allows the "exaggerated response" of forced psychotropic medication on the basis of purely institutional concerns. So serving institutional convenience eviscerates

---

1883 (43d ed. 1989), this form of "medical treatment" may reduce an inmate's dangerousness, not by improving his mental condition, but simply by sedating him with a medication that is grossly excessive for that purpose.

[18] For example, although psychotropic drugs were of mixed value in treating Harper's condition, *supra*, at 248, n. 16, they became the primary means of dealing with him. *E. g.*, Lodging, Book 8, Nov. 7, 1984, Hearing (Dr. Petrich reports: "The patient is still not able to negotiate with the treatment staff or work collectively with them. We have no idea as to the extent of his psychosis nor do we have any working relationship upon which to build internal and external controls"); *id.*, Book 8, Feb. 26, 1985 (Dr. Loeken reports: "because of his lack of participation in therapy it is recommended that the involuntary medication policy continue in use").

Forcing psychotropics on Harper also provoked counterproductive behavior. *E. g.*, *id.*, Book 8, Dec. 16, 1982 (Report of Dr. Petrich that Harper's assault on a male nurse and damage to a television were "in the context of his complaining about medication side effects. Overall the issue of involuntary medications and side effects is a major issue in his management"); *id.*, Book 8, Oct. 7, 1983 (therapist's report that Harper has indicated "that he is going to destroy unit property until the medications are stopped. He has recently destroyed the inmates['] stereo as an example of this").

the inmate's substantive liberty interest in the integrity of his body and mind.[19]

## III

The procedures of Policy 600.30 are also constitutionally deficient. Whether or not the State ever may order involuntary administration of psychotropic drugs to a mentally ill person who has been committed to its custody but has not been declared incompetent, it is at least clear that any decision approving such drugs must be made by an impartial professional concerned not with institutional interests, but only with the individual's best interests. The critical defect in Policy 600.30 is the failure to have the treatment decision made or reviewed by an impartial person or tribunal. See *Vitek*, 445 U. S., at 495.[20]

The psychiatrists who diagnose and provide routine care to SOC inmates may prescribe psychotropic drugs and recommend involuntary medication under Policy 600.30. The Policy provides that a nonemergency decision to medicate for up

---

[19] *Youngberg* v. *Romeo*, 457 U. S. 307 (1982), and *Parham* v. *J. R.*, 442 U. S. 584 (1979), are inapposite. Neither involved care of a presumptively competent individual; Romeo, a profoundly retarded adult with the mental capacity of an 18-month-old child, had been committed by the court to a state hospital for treatment, 457 U. S., at 309, and J. R. and appellees were children, 442 U. S., at 587. In addition, the deprivations of liberty at issue in both cases — use of physical restraints in *Youngberg* and institutionalization in *Parham* — fall far short of Harper's interest in refusing mind-altering drugs with potentially permanent and fatal side effects. Cf. *Bee* v. *Greaves*, 744 F. 2d 1387, 1395–1397 (CA10 1984) (forcible medication with psychotropics is not reasonably related to prison security), cert. denied, 469 U. S. 1214 (1985).

[20] It is not necessary to reach the question whether the decision to force psychotropic drugs on a competent person against his will must be approved by a judge, or by an administrative tribunal of professionals who are not members of the prison staff, in order to conclude that the mechanism of Policy 600.30 violates procedural due process. The choice is not between medical experts on the one hand and judges on the other; the choice is between decisionmakers who are biased and those who are not.

to seven consecutive days must be approved by a special committee after a hearing. The committee consists of the Associate Superintendent of SOC, a psychologist, and a psychiatrist. Neither of the medical professionals may be involved in the current diagnosis or treatment of the inmate. The approval of the psychiatrist and one other committee member is required to sustain a 7-day involuntary medication decision. Lodging, Book 9, Policy 600.30, p. 2, § 3.B. A similarly composed committee is required to authorize "long term" involuntary medication lasting over seven days. Policy 600.30 does not bar current treating professionals or previous committee members from serving on the long-term committee. This committee does *not* conduct a new hearing, but merely reviews the inmate's file and minutes of the 7-day hearing. Long-term approval, if granted, allows medication to continue indefinitely with a review and report by the treating psychiatrist every 14 days. *Id.*, Book 9, Policy 600.30, p. 2, § 3.C.[21]

These decisionmakers have two disqualifying conflicts of interest. First, the panel members must review the work of treating physicians who are their colleagues and who, in turn, regularly review their decisions. Such an in-house system pits the interests of an inmate who objects to forced medication against the judgment not only of his doctor, but often his doctor's colleagues.[22] Furthermore, the Court's

---

[21] Revised Policy 620.200 authorizes up to 14 consecutive days of involuntary medication before long-term committee approval is required, and adds a committee hearing to review continuing involuntary medication every 180 days thereafter. It also bars current treating personnel from sitting on the long-term committee. Lodging, Book 9, Policy 620.200, pp. 3–4.

[22] As regular SOC staff, 600.30 committee members are

"susceptible to implicit or explicit pressure for cooperation ('If you support my orders, I'll support yours'). It is instructive that month after month, year after year, this 'review' panel *always* voted for more medication—despite the scientific literature showing that periodic respites from drugs are advisable and that prolonged use of antipsychotic drugs is proper only

conclusion that "[n]one of the hearing committee members may be involved in the inmate's current treatment or diagnosis," *ante*, at 233, overlooks the fact that Policy 600.30 allows a treating psychiatrist to participate in all but the initial *7-day* medication approval.  This revolving door operated in Harper's case.  Dr. Petrich treated Harper through 1982 and recommended involuntary medication on October 27, 1982.  Lodging, Book 8, Oct. 27, 1982.  Dr. Loeken, staff psychologist Giles, and Assistant Superintendent Stark authorized medication for seven days after a 600.30 hearing on November 23, 1982.  Dr. Petrich then replaced Dr. Loeken on the committee, and with Giles and Stark approved long-term involuntary medication on December 8, 1982.  Solely under this authority, Dr. Petrich prescribed more psychotropic medication for Harper on December 8, 1982, and throughout the following year.[23]

---

when the medical need is clear and compelling."  Psychologists' Brief 26–27 (footnote omitted).

Rates of approval by different review bodies are of limited value, of course, because institutions will presumably adjust their medication practices over time to obtain approval under different standards or by different reviewing bodies.  However, New Jersey's review of involuntary psychotropic medication in mental institutions is instructive.  In 1980 external review by an "independent psychiatrist" who was not otherwise employed by the Department of Human Services resulted in discontinuation or reduction of 59% of dosages.  After the Department moved to an internal peer review system, that percentage dropped to 2.5% of cases.  Brief for New Jersey Department of Public Advocate as *Amicus Curiae* 38–54.

[23] All of Harper's prescription entries from November 20, 1982, through December 8, 1982, were made "per Dr. Petrich."  Lodging, Book 7, primary encounter reports of Nov. 20, 1982, Dec. 2, 1982, Dec. 8, 1982. After Harper's return to the SOC in December 1983, Dr. Loeken became his primary physician, and committees again approved 7-day, then long-term, involuntary medication.  Although Dr. Petrich was not on these committees, he sat on the next three 180-day review committees, voting to authorize forced medication through January 1986.  Trial Court Finding 7, App. to Pet. for Cert. B-7.

Second, the panel members, as regular staff of the Center, must be concerned not only with the inmate's best medical interests, but also with the most convenient means of controlling the mentally disturbed inmate. The mere fact that a decision is made by a doctor does not make it "certain that professional judgment in fact was exercised." *Youngberg* v. *Romeo*, 457 U. S. 307, 321 (1982). The structure of the SOC committee virtually ensures that it will not be. While the initial inquiry into the mental bases for an inmate's behavior is medical, the ultimate medication decision under Policy 600.30 turns on an assessment of the risk that an inmate's condition imposes on the institution. The prescribing physician and each member of the review committee must therefore wear two hats. This hybrid function disables the independent exercise of each decisionmaker's *professional* judgment.[24] The

---

[24] The Court cites *Vitek* v. *Jones*, 445 U. S. 480 (1980), and *Parham* as "previous cases involving medical decisions implicating similar liberty interests [in which] we have approved use of similar internal decisionmakers." *Ante*, at 233–234. Aside from the greater liberty interest implicated by forced psychotropic medication, SOC decisionmakers face different demands than their professional counterparts in *Vitek* and *Parham*. In *Vitek*, the Nebraska state transfer policy at issue affected only prisoners determined to be mentally ill who could not "adequately be treated within the penal complex." 445 U. S., at 489. We found that the determination of the necessity of transfer for treatment, "a question that is essentially medical," could be made fairly by professionals after a meaningful hearing. *Id.*, at 495. Similarly, we understood the civil commitment decision at issue in *Parham* to involve examination of the child, review of medical records, and a diagnosis and determination of "whether the child will likely benefit from institutionalized care," emphasizing that "[w]hat is best for a child is an individual medical decision . . . of what the child requires." 442 U. S., at 614–615, 608. Both of these procedures sought to reach an accurate medical determination of the patient's treatment needs without reference to the institution's separate interests. We concluded that, despite their positions inside the Nebraska prison and Georgia hospital, these medical professionals were capable of exercising the independence of professional judgment required by due process. None of the medical professionals at the SOC, charged with making medication decisions in light

structure of the review committee further confuses the objective of the inquiry; two of the committee members are not trained or licensed to prescribe psychotropic drugs, and one has no medical expertise at all. The trump by institutional interests is dramatized by the fact that appeals of committee decisions under the Policy are made solely to the SOC Superintendent.[25]

The Court asserts that "[t]here is no indication that any institutional biases affected or altered the decision to medicate respondent against his will" and that there is no evidence that "antipsychotic drugs were prescribed not for medical purposes, but to control or discipline mentally ill patients." *Ante*, at 233, and 234, n. 13. A finding of bias in an individual case is unnecessary to determine that the structure of Policy 600.30 fails to meet the due process requirements of the Fourteenth Amendment. In addition, Harper's own record illustrates the potential abuse of psychotropics under Policy 600.30 for institutional ends. For example, Dr. Petrich added Taractan, a psychotropic drug, to Harper's medication around October 27, 1982, noting: "The goal of the increased medication to sedate him at night and relieve the residents and evening *[sic]* alike of the burden of supervising him as intensely."[26] A 1983 examination by non-SOC physicians

of the inmate's impact on the institution and its needs, can claim such independence.

[25] Lodging, Book 9, Policy 600.30, p. 4. The Court notes that an inmate may bring a personal restraint petition or seek an extraordinary writ under Wash. Rules App. Proc. 16.3 to 16.17, *ante*, at 216, 235. However, a non-emergency involuntary medication decision demands—as the existence of a SOC Policy attests—meaningful administrative review of this deprivation of liberty, not merely the existence of collateral judicial mechanisms. Cf. *Ingraham* v. *Wright*, 430 U. S. 651 (1977).

[26] Lodging, Book 8, Oct. 27, 1982. Indeed, a "psychiatric security attendant," not a doctor, made the first recorded request for involuntary medication after Harper attempted to pull the guard's hand through a food slot. The guard filed a disciplinary "Infraction Report" which concluded: "Sug-

also indicated that Harper was prophylactically medicated absent symptoms that would qualify him for involuntary medication.[27]

The institutional bias that is inherent in the identity of the decisionmakers is unchecked by other aspects of Policy 600.30. The committee need not consider whether less intrusive procedures would be effective, or even if the prescribed medication would be beneficial to the prisoner, before approving involuntary medication. Findings regarding the severity or the probability of potential side effects of drugs and dosages are not required. And, although the Policy does not prescribe a standard of proof necessary for any factual determination upon which a medication decision rests, the Court gratuitously advises that the "clear, cogent, and convincing" standard adopted by the State Supreme Court would be unnecessary.[28]

---

gestion: This inmate is in need of involuntary medication. He is a threat to the safety + security of the institution." *Id.*, Book 1–2, Oct. 22, 1982. Five days later, Dr. Petrich, citing the incident, recommended involuntary medication. *Id.*, Book 8, Oct. 27, 1982.

[27] Harper was transferred on November 16, 1983, to Washington State Reformatory, where a psychiatrist on its Multidisciplinary Advisory Committee found:

"To this date, he has not exhibited behavior in the presence of any committee members or custody staff that would qualify him under involuntary medication policy. He does have a long history of recurrent difficulty and as best as we can tell SOC instituted the involuntary policy and *continued it on the basis of past bad faith;* however, we do not have any of that data available to us." *Id.*, Book 3, Nov. 30, 1983 (emphasis added).

See also *id.*, Book 8, May 1, 1985, Hearing ("[T]he inmate[']s behavior during the committee hearing did not meet the criteria for gravely disabled or self injurious behavior. Involuntary medication is continued on the basis of potential violent behavior towards others which has been well documented in the inmate's history").

[28] *Ante*, at 235. In *Addington v. Texas*, 441 U. S. 418 (1979), we held that the medical conditions for civil commitment must be proved by clear and convincing evidence. The purpose of this standard of proof, to reduce

Nor is the 600.30 hearing likely to raise these issues fairly and completely. An inmate recommended for involuntary medication is no more capable of "'speaking effectively for himself'" on these "issues which are 'complex or otherwise difficult to develop or present'" than an inmate recommended for transfer to a mental hospital. *Vitek*, 445 U. S., at 498 (Powell, J., concurring in part). Although single doses of some psychotropic drugs are designed to be effective for a full month, the inmate may not refuse the very medication he is contesting until 24 hours before his hearing.[29] Policy 600.30 also does not allow the inmate to be represented by counsel at hearings, but only to have present an adviser, who is appointed by the SOC. Lodging, Book 9, Policy 600.30, pp. 3–4. These advisers, of questionable loyalties and efficacy, cannot provide the "independent assistance" required for an inmate fairly to understand and participate in the hearing process. 445 U. S., at 498.[30] In addition, although the Policy gives the inmate a "limitable right to present testimony through his own witnesses and to confront and cross-examine witnesses," in the next paragraph it takes that right away for reasons that "include, but are not limited to such

---

the chances of inappropriate decisions, *id.*, at 427, is no less meaningful when the factfinders are professionals as when they are judges or jurors.

[29] Lodging, Book 9, Policy 600.30, p. 2. Prolixin decanoate, for example, is "a highly potent behavior modifier with a markedly extended duration of effect"; onset is between 24 to 72 hours after injection and effects can last 4–6 weeks. Physician's Desk Reference 1641–1642 (43d ed. 1989).

[30] The prisoner is introduced to, and may consult with, his appointed adviser at the commencement of the hearing. Harper's adviser on November 23, 1982, a nurse practitioner from Washington State Reformatory, asked Harper three questions in the hearing. Lodging, Book 8, Nov. 23, 1982, Hearing. The other five advisers appointed for Harper never spoke in the hearings. All five were apparently staff at the SOC: SOC Psychiatric Social Worker Hyden (who sat for the SOC Assistant Superintendent on the next 180-day committee that reapproved Harper's medication), a prison chaplain, two registered nurses, and a correctional officer. *Id.*, Book 8, Dec. 8, 1982, Dec. 30, 1983, Jan. 5, 1984, Oct. 31, 1984, and Nov. 7, 1984, Hearings.

things as irrelevance, lack of necessity, redundancy, possible reprisals, or other reasons relating to institutional interests of security, order, and rehabilitation." Lodging, Book 9, Policy 600.30, p. 3. Finally, because Policy 600.30 provides a hearing only for the 7-day committee, and just a paper record for the long-term committee, the inmate has no opportunity at all to present his objections to the more crucial decision to medicate him on a long-term basis.

In sum, it is difficult to imagine how a committee convened under Policy 660.30 could conceivably discover, much less be persuaded to overrule, an erroneous or arbitrary decision to medicate or to maintain a specific dosage or type of drug. See *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976). Institutional control infects the decisionmakers and the entire procedure. The state courts that have reviewed comparable procedures have uniformly concluded that they do not adequately protect the significant liberty interest implicated by the forced administration of psychotropic drugs.[31] I agree with that conclusion. Although a review procedure administered by impartial, nonjudicial professionals might avoid the constitutional deficiencies in Policy 600.30, I would affirm the decision of the Washington Supreme Court requiring a judicial hearing, with its attendant procedural safeguards, as a remedy in this case.

---

[31] Many States require a judicial determination of incompetence, other findings, or a substituted judgment when a patient or inmate refuses psychotropic drugs. *E. g.*, *Riese* v. *St. Mary's Hospital and Medical Center*, 209 Cal. App. 3d 1303, 243 Cal. Rptr. 241 (1st Dist. 1988), review granted but dism'd, 774 P. 2d 698 (1989); *People* v. *Medina*, 705 P. 2d 961 (Colo. 1985) (en banc); *In re Boyd*, 403 A. 2d 744 (D. C. 1979); *In re Mental Commitment of M. P.*, 510 N. E. 2d 645 (Ind. 1987); *Rogers* v. *Commissioner of Dept. of Mental Health*, 390 Mass. 489, 458 N. E. 2d 308 (1983); *Jarvis* v. *Levine*, 418 N. W. 2d 139 (Minn. 1988); *Opinion of the Justices*, 123 N. H. 554, 465 A. 2d 484 (1983); *Rivers* v. *Katz*, 67 N. Y. 2d 485, 495 N. E. 2d 337 (1986); *In re Mental Health of K. K. B.*, 609 P. 2d 747 (Okla. 1980); *State ex rel. Jones* v. *Gerhardstein*, 141 Wis. 2d 710, 416 N. W. 2d 883 (1987).

I continue to believe that "even the inmate retains an unalienable interest in liberty—at the very minimum the right to be treated with dignity—which the Constitution may never ignore." *Meachum* v. *Fano*, 427 U. S. 215, 233 (1976) (dissenting opinion). A competent individual's right to refuse psychotropic medication is an aspect of liberty requiring the highest order of protection under the Fourteenth Amendment.[32] Accordingly, with the exception of Part II, I respectfully dissent from the Court's opinion and judgment.

---

[32] Only Harper's due process claim is before the Court. *Ante*, at 218, n. 5. His First Amendment, equal protection, state constitutional, and common-law tort claims have not yet been considered by the Washington state courts.