# Supreme Court of Florida

_____

No. SC16-1478
_____

**ROBERT E. BANKS,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[December 21, 2017]

QUINCE, J.

This case is before the Court for review of the decision of the First District Court of Appeal in Banks v. Jones, 197 So. 3d 1152 (Fla. 1st DCA 2016). The district court certified that its decision is in direct conflict with the decision of the Fifth District Court of Appeal in Holland v. State, 791 So. 2d 1256 (Fla. 5th DCA 2001), on the issue of whether a petition for a writ of habeas corpus is the proper vehicle by which to seek release from close management. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.

## FACTS

Robert E. Banks was serving a thirty-year sentence for a robbery conviction. Banks, 197 So. 3d at 1156. After receiving a disciplinary report for a spitting incident, the Department of Corrections adjudicated Banks guilty for violating department rules, placed him in disciplinary confinement, and revoked 364 days of gain time in addition to issuing a referral reassigning him to the "Close Management I" housing classification. Id.

Banks first challenged the referral with the Department, which upheld the decision. Banks then filed a petition for a writ of habeas corpus with the Eighth Judicial Circuit Court. Id. The Eighth Circuit denied relief, stating that Banks failed to demonstrate that he was entitled to relief. Id. at 1157. Banks filed a petition for a writ of certiorari in the First District, which ordered the Department to show cause why the writ should not be granted. Subsequently, the First District determined to hear the case en banc to determine whether it should recede from its prior precedent. Id.

Reviewing Banks' claim, the First District stated: "Most pertinent to our decision here is the initial question of whether prisoners in Florida have a protected liberty interest in remaining in the general population, thus necessitating a determination of whether a decision removing a prisoner from the general population for reassignment to Close Management implicates due process

requirements." Id. at 1159 (citing Sandin v. Conner, 515 U.S. 472 (1995)). The First District reasoned that "[i]f a liberty interest is not at stake, judicial review . . . would be more appropriately considered as an appeal of an administrative decision rather than a claim that a person is being illegally detained." Id. Although the First District recognized that the Sandin Court "left open the possibility that states could create liberty interests which triggered due process protections,"[1] the court nevertheless reasoned that "Sandin clearly announced that any prison regulation which did not impose an atypical hardship on state prisoners would not implicate due process protections." Id. at 1160 (citing Sandin, 515 U.S. at 481). So reasoning, the First District announced its decision to "recede from prior decisions . . . allow[ing] Close Management decisions to be challenged by writ of habeas corpus." Id. at 1162. Relying on our decision in Bush v. State, 945 So. 2d 1207, 1210 (Fla. 2006), the First District reasoned that because prisoners challenging their assignment to close management were not seeking immediate release, the appropriate vehicle for their claims is a petition for a writ of mandamus. Banks, 197 So. 3d at 1163. Therefore, the First District determined: "[B]ecause habeas corpus review of such claims does not accord the proper deference due the Executive Branch . . . we recede from prior decisions of this

---

1. Id. at 1160 (citing Board of Pardons v. Allen, 482 U.S. 369 (1987); Washington v. Harper, 494 U.S. 210 (1990); Vitek v. Jones, 445 U.S. 480 (1980)).

court which hold that challenges to Close Management housing assignments may be asserted by petition for writ of habeas corpus." Banks, 197 So. 3d at 1155 (citing Magwood v. Tucker, 98 So. 3d 725 (Fla. 1st DCA 2012); Kendrick v. McNeil, 6 So. 3d 657 (Fla. 1st DCA 2009); Thompson v. Dugger, 509 So. 2d 391, 392 (Fla. 1st DCA 1987)).

The First District certified conflict with Holland.[2] Banks sought review in this Court, which we granted.

---

2. The decision in Holland, in its entirety, states:

Holland appeals from an order of the circuit court, which denied his petition for a writ of habeas corpus. In the petition, Holland sought to compel the Secretary of the Florida Department of Corrections to release him from "close management," and return him to the general population of the prison where he is incarcerated (North Florida Reception Center). The circuit court found that Holland had been placed in "close management" because of a long series of disciplinary infractions.

In this petition, Holland has raised no issue concerning harassment, lack of due process, failure of the state to comply with its own rules regarding "close management," or other grounds, which would provide a basis to grant his release from "close management." Under these circumstances, as he is legally confined in prison, the writ was properly denied.

Holland, 791 So. 2d at 1257 (footnotes omitted).

- 4 -

**MOOTNESS**

The Department argues that because Banks has been released from close management and transferred to a facility that does not house prisoners in close management quarters, the case is moot and this Court should exercise its discretion and discharge jurisdiction. While the Department is correct that Banks, himself, does not have a current controversy, the First District's decision is broader than Banks' dispute. Because the First District receded from over three decades of precedent and circuit courts who would ordinarily review the habeas petitions are bound by its decision, our determination of the certified conflict is necessary for guidance to our trial and appellate courts. Therefore, we decline the State's offer to discharge jurisdiction. See, e.g., Pino v. Bank of New York, 76 So. 3d 927, 927-28 (Fla. 2011) (discussing a certified question of great public importance and stating that the question "transcends the individual parties to this action because it has the potential to impact [the courts] throughout this state and is one on which Florida's trial courts and litigants need guidance."); Williams v. State, 957 So. 2d 600, 601 (Fla. 2007) (retaining jurisdiction in a certified conflict case despite mootness); State v. Matthews, 891 So. 2d 479, 483 (Fla. 2004) (retaining discretionary certified conflict jurisdiction despite Matthews' release from prison because "the question before this Court is of great public importance and is likely to recur") (citing Holly v. Auld, 450 So. 2d 217, 218 n.1 (Fla. 1984)); Enterprise

Leasing Co. v. Jones, 789 So. 2d 964, 965 (Fla. 2001) ("Although the issue presented in this appeal may be moot as it relates to these parties, the mootness doctrine does not destroy our jurisdiction when the question before us is of great public importance or is likely to recur.") (citing Gregory v. Rice, 727 So. 2d 251, 252 n.1 (Fla. 1999)); N.W. v. State, 767 So. 2d 446, 447 n.2 (Fla. 2000) (retaining discretionary certified conflict jurisdiction after the appellant's community control expired because "this case presents a controversy capable of repetition, yet evading review [and] should be considered on its merits." (citing Kight v. Dugger, 574 So. 2d 1066 (Fla. 1990)).

## DISCUSSION

The issue before this Court is whether an inmate may petition for a writ of habeas corpus to challenge his or her placement in Close Management I (CMI) or whether said inmate must file a petition for a writ of mandamus. Because we find that an inmate may have a limited liberty interest in being housed with the general population as compared to CMI depending on the duration of reassignment, we hold that a petition for a writ of habeas corpus remains the correct mechanism by which to challenge a reassignment. We therefore quash the decision of the First District to the extent it holds otherwise and adopt the reasoning of Judge Wolf's concurring in part and dissenting in part opinion.

The United States Supreme Court's 1983 decision in <u>Hewitt v. Helms</u>, 459 U.S. 460 (1983), upon which the First District previously relied, concerned a prisoner's complaint that the Pennsylvania State Correctional Institution at Huntingdon violated his Fourteenth Amendment due process rights by confining him to administrative segregation within the prison after he assaulted two guards. <u>Id.</u> at 462-63.  The <u>Hewitt</u> Court indicated:

> While no State may "deprive any person of life, liberty, or property, without due process of law," it is well settled that only a limited range of interests fall within this provision.  Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States.

<u>Hewitt</u>, 459 U.S. at 466 (citing <u>Meachum v. Fano</u>, 427 U.S. 215, 223-227 (1976)).  The Court then opined, "While there is little question on the record before us that [Hewitt's] confinement added to the restraints on this freedom, we think his argument seeks to draw from the Due Process Clause more than it can provide." <u>Id.</u> at 467 (footnote omitted).  The <u>Hewitt</u> Court recognized:

> We have repeatedly said both that prison officials have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interests.  As to the first point, we have recognized that broad discretionary authority is necessary because the administration of a prison is "at best an extraordinarily difficult undertaking," <u>Wolff v. McDonnell</u>, [418 U.S.] at 566, and have concluded that "to hold . . . that <u>any</u> substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." <u>Meachum v.</u>

Fano, [427 U.S.] at 225. As to the second point, our decisions have consistently refused to recognize more than the most basic liberty interests in prisoners. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285 (1948). Thus, there is no "constitutional or inherent right" to parole, Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7 (1979), and "the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison," Wolff v. McDonnell, [418 U.S.] at 557, despite the undoubted impact of such credits on the freedom of inmates. Finally, in Meachum v. Fano, [427 U.S.] at 225, the transfer of a prisoner from one institution to another was found unprotected by "the Due Process Clause in and of itself," even though the change of facilities involved a significant modification in conditions of confinement, later characterized by the Court as a "grievous loss." Moody v. Daggett, 429 U.S. 78, 88 n. 9 (1976). As we have held previously, these decisions require that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." Montanye v. Haymes, 427 U.S. 236, 242 (1976). See also Vitek v. Jones, 445 U.S. 480, 493 (1980).

Hewitt, 459 U.S. at 467-68 (emphasis added). The Hewitt Court reasoned, "It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." Id. at 468.

The Hewitt Court's analysis did not end there, however. Instead, the Court determined that a State could create a liberty interest with enactment of regulations governing the administration of state prisons. And, under such an enactment, when

the State uses language that is mandatory in nature, the process afforded an inmate must satisfy the minimum requirements of the Due Process Clause. Id. at 469-72.

In 1995, the United States Supreme Court reconsidered its ruling in Hewitt. See Sandin v. Conner, 515 U.S. 472, 474 (1995) ("We granted certiorari to reexamine the circumstances under which state prison regulations afford inmates a liberty interest protected by the Due Process Clause.") The Sandin Court determined that the Hewitt approach had "led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." Id. at 482. The Court reasoned that the inmate at issue had not been afforded a liberty interest that would entitle him to the procedural protections under Wolff v. McDonnell, 418 U.S. 539 (1974), stating that his confinement "was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." Sandin, 515 U.S. at 487. The Sandin decision, at its core, criticized only the methodology used in Hewitt to determine what liberty interest, if any, was at stake. See Wilkinson v. Austin, 545 U.S. 209, 222 (2005) ("In Sandin, we criticized [the Hewitt] methodology as creating a disincentive for States to promulgate procedures for prison management, and as involving the federal courts in the day-to-day management of prisons.") (citing Sandin, 515 U.S. at 482-83). The Court in Wilkinson further pointed out the real impact of the Court's prior opinion, when it said:

> After Sandin, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves "in relation to the ordinary incidents of prison life."

Id. at 223 (quoting Sandin, 515 U.S. at 484) (emphasis added).

The Florida Administrative Code defines close management as "the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others." Fla. Admin. Code R. 33-601.800(1)(d). Close Management I (CMI) "is the most restrictive single cell housing level of all the close management status designations." Fla. Admin. Code R. 33-601.800(2)(a)1. "An inmate assigned to CMI will be ineligible for a work assignment." Fla. Admin. Code R. 33-601.800(2)(a)2.

The First District's analysis of Sandin is contradicted by the United States Supreme Court's decision in Wilkinson. The holding of Sandin is not, as the Banks majority interprets it, that an inmate has no liberty interest in remaining in general population, but that the test to determine whether an inmate's liberty interest has been infringed is not based on the statutory language but whether the confinement imposes atypical and significant hardship on the inmate in relation to

- 10 -

ordinary incidents of prison life. Sandin, 515 U.S. at 484.[3] A court may appropriately review that question pursuant to an inmate's petition for a writ of habeas corpus. The First District's conclusion that habeas is not the proper vehicle because there is no liberty interest is based on a misapplication of Sandin[4] and is belied by its own reasoning that a prisoner may still file a petition for a writ of habeas corpus to allege a violation of the Eighth Amendment even if a successful challenge would not permit the inmate's release from prison but only to general population. Banks, 197 So. 3d at 1167 (stating that the decision would permit an inmate to file a petition for a writ of habeas corpus to allege a claim that the conditions of Close Management constitute cruel and unusual punishment in

---

3. Federal courts in Florida have continued to consider prisoners' federal habeas claims regarding confinement classifications post-Sandin. See, e.g., Whitsett v. Cannon, 139 F. Supp. 3d 1293 (Fla. M.D. 2015).

4. As Justice Breyer explains in his dissent:

Thus, this Court has said that certain changes in conditions may be so severe or so different from ordinary conditions of confinement that, whether or not state law gives state authorities broad discretionary power to impose them, the state authorities may not do so "without complying with minimum requirements of due process." Vitek v. Jones, 445 U.S. 480, 491-494 (1980) ("involuntary commitment to a mental hospital"); Washington v. Harper, 494 U.S. 210, 221-222 (1990) ("unwanted administration of antipsychotic drugs").

Sandin, 515 U.S. at 493 (Breyer, J., dissenting).

violation of the Eighth Amendment). As reasoned in Judge Wolf's concurring and dissenting opinion, which we adopt here, the determination that Banks is not entitled to relief does not and should not require the full foreclosure of habeas petitions relating to Close Management assignments. Banks, 197 So. 3d at 1170-71 (Wolf, J., concurring in part and dissenting in part) ("Inmates segregated from the general population for a potentially significant period of time should continue to have the same reasonable court oversight concerning their segregation from the general prison population that they have had since 1982. Insignificant justification has been provided to overturn our precedent and to effectively extinguish this important safeguard."). The appropriate analysis for the reviewing court is whether an inmate's assignment to close management constitutes an "atypical, significant deprivation." See Sandin, 515 U.S. at 484, 486. In addition to reviewing the details of the assignment, the length of the assignment would also be relevant to the reviewing court's analysis. Id. (noting that Sandin's placement was only for thirty days and that his disciplinary record had been expunged). The placement in Wilkinson was indefinite like the placement in Banks and unlike the one in Sandin. Id. at 224. Also, an inmate's loss of gain time and the length of his or her sentence would be relevant to the reviewing court's analysis.[5]

---

5. Here, Banks lost 364 days of gain time but he did not challenge the loss. The Sandin Court also left open for review "State's actions [that] will inevitably affect the duration of [an inmate's] sentence." Sandin, 515 U.S. at 487. The

For the foregoing reasons, we quash the en banc decision of the First District below and approve of the conflict case. Because Banks has been released, we decline to address the second issue presented.

It is so ordered.

LABARGA, C.J., and PARIENTE, and LEWIS, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

POLSTON, J., dissenting.

Because reassignment to close management does not establish a liberty interest sufficient to trigger the protection of the Due Process Clause, I would approve the decision of the First District Court of Appeal and hold that inmates may not challenge their close management status by petition for writ of habeas corpus, but must do so by petition for writ of mandamus, as held below. Therefore, I respectfully dissent.

The Fourteenth Amendment of the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due

---

Department illogically argues that Banks' loss of gain time is not relevant to this Court's decision because Banks did "not assert that any gain time he would have earned could entitled him to . . . early release from his 30-year prison sentence." Resp't's Answer Br. at 22.

process of law." A Fourteenth Amendment liberty interest may originate either from the Due Process Clause itself or from state law. Meachum v. Fano, 427 U.S. 215, 225-26 (1976). In Wolff v. McDonnell, 418 U.S. 539, 556-58 (1974), the United States Supreme Court determined that a statutory provision that dictated mandatory reductions in prison sentences for good behavior created a liberty interest in an inmate's particular sentence such that procedural due process protections applied in prison disciplinary proceedings. Thereafter in Meachum, the United States Supreme Court determined that the Due Process Clause is not implicated in every change in an inmate's conditions of confinement, holding that an inmate does not possess a liberty interest in being free from transfers between prison facilities. 427 U.S. at 224-25. Following Wolff and Meachum, the United States Supreme Court in Hewitt v. Helms, 459 U.S. 460, 471 (1983), shifted the analysis to whether the state action "used language of an unmistakably mandatory character" to determine whether a protected liberty interest was created.

Importantly, the United States Supreme Court in Sandin v. Conner, 515 U.S. 472, 481-83 (1995), refocused the approach to defining liberty interests by analyzing "the nature of the deprivation" experienced by the inmate as opposed to the mandatory language of a state regulation. In Sandin, the United States Supreme Court examined the due process claims of an inmate who was sentenced to 30 days of disciplinary confinement. Id. at 475-76. The Court pointed out the

- 14 -

flawed analysis adopted in Hewitt, noting "that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause." Id. at 483. The Court recognized that although a State may create protected liberty interests through regulations or policies, those "interests will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484. If the conditions of confinement do not impose an "atypical and significant hardship on the inmate," there is no constitutionally protected liberty interest in avoiding restrictive confinement conditions. Id. at 483-86. Specifically, due process protection is triggered if the conditions of confinement "present a dramatic departure from the basic conditions of [an inmate's] indeterminate sentence." Id. at 485.

Focusing on the nature of the confinement instead of the language of the regulations, the United States Supreme Court in Sandin examined the nature of the 30-day disciplinary confinement and concluded that "[b]ased on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment." Id. at 486. Accordingly, the Court held that "neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded [the inmate] a protected

- 15 -

liberty interest that would entitle him to the procedural protections set forth in

Wolff." Id. at 487. The 30-day disciplinary confinement "did not present the type

of atypical, significant deprivation in which a State might conceivably create a

liberty interest." Id. at 486.

The liberty interest inquiry articulated in Sandin requires a determination of

whether assignment to close management "imposes atypical and significant

hardship on the inmate in relation to the ordinary incidents of prison life." Id. at

484. Then, in Wilkinson v. Austin, 545 U.S. 209, 223 (2005), the United States

Supreme Court reiterated "that the touchstone of the inquiry into the existence of a

protected, state-created liberty interest in avoiding restrictive conditions of

confinement is not the language of regulations regarding those conditions but the

nature of those conditions themselves 'in relation to the ordinary incidents of

prison life.' " (quoting Sandin, 515 U.S. at 484).

Here, because assignment to close management does not present conditions

where an inmate would suffer an atypical and significant hardship, no procedural

due process is due. The conditions of confinement under the close management

classification are as follows:

> When assigned to Close Management housing, the inmate is
> visited regularly by Department staff, and irregularly by other staff, to
> ensure the inmate's safety and health. Fla. Admin. Code. R. 33–
> 601.800(15). Daily visits are conducted by medical personnel, the
> institution's housing supervisor, and the officer supervising the
> correctional staff; weekly visits are conducted by the warden and

assistant wardens, the security chief, and a classification officer. A Chaplain also visits weekly, and can visit more often if requested and if the Chaplain's schedule permits.

Close Management inmates may possess certain personal items, including hygiene items, electronic devices for listening to music, religious literature, personal property that does not pose security risks, writing paper, stamps, envelopes, and security pens to facilitate correspondence. Close Management inmates may conduct their legal affairs, have access to approved reading material and borrow library books, subscribe to magazines and newspapers, and use in-cell education and wellness opportunities. If the Close Management inmate does not violate a significant institutional rule, they may conduct bank transactions and order from the canteen. Fla. Admin. Code. R. 33–601.800(10)(g).

Close Management inmates may have visitors by appointment. In addition, they are allotted six hours of outdoor exercise each week. Inmates assigned to CM II and CM III may obtain work assignments. Fla. Admin. Code. R. 33–601.800(10)(m) & (13). To provide incentive for improved behavior, privileges may increase as the inmate progresses to more lenient Close Management status. Fla. Admin. Code. R. 33–601.800(11).

Banks v. Jones, 197 So. 3d 1152, 1158 (Fla. 1st DCA 2016).

As to the duration of confinement, placement in close management is

reviewed as follows:

During the first 60 days of Close Management, the inmate's placement is reviewed weekly by a member of the institution's Classification Team; following that, review is monthly. Fla. Admin. Code. R. 33–601.800(16)(a). After six months, the inmate's Classification Officer interviews and assesses the inmate, the previous placement decision, and whether a change in status is advisable. Fla. Admin. Code. R. 33–601.800(16)(c). In addition, the State's Classification Officer interviews the inmate no less often than every six months to determine whether the status remains appropriate or must be modified, including whether the inmate should be reassigned to the general population. Fla. Admin. Code. R. 33–601.800(16)(e).

- 17 -

Id.

Although close management inmates experience more restrictive conditions than inmates in the general population, that fact does not render such confinement atypical or a significant hardship. The regulations outlining the parameters of confinement in close management do not present conditions that are atypical of those experienced by the general population. Inmates in close management retain personal property, including a radio for listening to music, writing paper and a security pen, personal hygiene items, and reading materials. See Fla. Admin. Code. R. 33–601.800(10). Close management Inmates may conduct their legal affairs with access to the law library and personal legal papers. See Fla. Admin. Code. R. 33–601.800(10)(i). An exercise schedule ensures a minimum of six hours of outdoor exercise per week. See Fla. Admin. Code. R. 33–601.800(10)(m). Without a major rule violation, close management inmates may make canteen purchases. See Fla. Admin. Code. R. 33–601.800(10)(g). Inmates assigned to all but the most restrictive close management status are eligible for work assignments. See Fla. Admin. Code. R. 33–601.800(13). Additionally, close management inmates may have visitors by appointment, and are visited regularly by staff. See Fla. Admin. Code. R. 33–601.800(11), (15). Accordingly, reassignment to close management "is not dissimilar to a transfer from a less-secure to a more-secure institution, where a prisoner must adapt to more

burdensome and strict living conditions." Banks, 197 So. 3d at 1161. The conditions of confinement in close management are insufficient to "present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." See Sandin, 515 U.S. at 486. Therefore, Banks does not have a protected liberty interest to remain in the general population.

The majority concludes that confinement in close management creates a liberty interest because it erroneously determines that the conditions are analogous to the assignment to a supermax facility such as the one at issue in Wilkinson. See majority op. at 12 ("The placement in Wilkinson was indefinite like the placement in Banks and unlike the one in Sandin."). In Wilkinson, the United States Supreme Court found that inmates had a constitutionally protected liberty interest in avoiding assignment to a state supermax facility. 545 U.S. at 213. In comparing the conditions between general population and disciplinary segregation to a supermax prison, the United States Supreme Court focused on the extreme isolation of the restrictive confinement where inmates were "deprived of almost any environmental or sensory stimuli and of almost all human contact." Id. at 214. Specifically, for inmates in the supermax facility "almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room." Id. at 223-24. The duration of "placement at

- 19 -

[the supermax facility] is for an indefinite period of time, limited only by an inmate's sentence," and "[i]nmates otherwise eligible for parole lose their eligibility while incarcerated at [the supermax facility]." Id. at 214-15. The United States Supreme Court determined that the conditions associated with assignment to the supermax facility imposed an atypical and significant hardship when compared to conditions associated with general population, implicating a liberty interest. Id. at 223-24.

However, the conditions of confinement experienced by close management inmates are materially different than the conditions of the supermax facility the Supreme Court found to be atypical in Wilkinson. Unlike the inmates in Wilkinson, close management inmates are not deprived of all environmental or sensory stimuli or all human contact. Close management inmates are afforded regular contact with staff and visitors by appointment, 6 hours outdoor recreation every week, placement review weekly during the first 60 days, monthly after that, and formal review after 6 months and every 6 months following. Therefore, I disagree with the majority's conclusion that the conditions of close management are analogous to placement in the supermax facility, rendering such confinement atypical.

Moreover, without a liberty interest to remain in the general population, habeas corpus is not the proper mechanism to challenge the reassignment to close

management.  Habeas exists as a remedy for restraints on individual liberty, and without a liberty interest that would trigger due process protections, no remedy could be achieved through a petition for writ of habeas corpus.  See Sneed v. Mayo, 66 So. 2d 865, 869 (Fla. 1953) ("The great writ of habeas corpus is a writ of right obtainable under our Constitution by all men who claim to be unlawfully imprisoned against their will.  It is designed to test solely the legality of the petitioner's imprisonment, and may not be used as a substitute for appeal."); see generally Bush v. State, 945 So. 2d 1207, 1210 (Fla. 2006) ("[I]f the prisoner alleges entitlement to immediate release, a petition for writ of habeas corpus is the proper remedy . . . ."); Murray v. Regier, 872 So. 2d 217, 222 (Fla. 2002) ("[T]he traditional purpose of the writ of habeas corpus is to furnish a . . . remedy to one whose liberty is unlawfully restrained.").

Therefore, as the First District explained, inmates may challenge their status of close management through mandamus relief by asserting that the detention is not supported by the agency's rules.  See Banks, 197 So. 3d at 1167 ("[I]f a prisoner alleges he has been deprived of the periodic review required by the rules . . . he may be entitled to mandamus relief; merely disagreeing with the Department's discretionary decisions cannot show entitlement to relief, as there would be no showing of a 'clear legal right.' ").

To summarize, because inmates do not possess a liberty interest in avoiding assignment to close management, mandamus is the proper vehicle to seek release from close management. Therefore, I would approve the decision of the First District. I respectfully dissent.

CANADY and LAWSON, JJ., concur.

Application for Review of the Decision of the District Court of Appeal – Certified Direct Conflict of Decisions

    First District - Case No. 1D15-330

    (Bradford County)

Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee, Florida,

    for Petitioner

Pamela Jo Bondi, Attorney General, Denise M. Harle, Deputy Solicitor General, and Daniel A. Johnson, Assistant Attorney General, Tallahassee, Florida,

    for Respondent