# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of | No. 59318-1-II |
| B.H., | |
| | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—In 2022, BH punched a jail security guard and the State charged him with third degree assault. A trial court found that BH was not competent to stand trial and committed him to Western State Hospital. There, a psychiatrist diagnosed BH with schizoaffective disorder and prescribed him risperidone, an antipsychotic medication. After BH began refusing to take the medication, started fights with other hospital patients, and assaulted staff, BH's physicians petitioned for an order to involuntarily medicate him with risperidone and olanzapine, another antipsychotic medication. A superior court commissioner presided over the involuntary medication hearing, during which BH again attempted to assault staff. The commissioner granted the petition, approving both antipsychotic medications up to their maximum dosages. BH then moved to revise the order. The trial court denied the motion.

BH appeals, arguing there was not substantial evidence to support authorization of involuntary treatment using up-to-maximum dosages of the medications. He also argues that the order violated his First Amendment rights to practice his religion.

We affirm.

FACTS

A.     Background and Prior Commitments

BH spent 31 months in Western State Hospital from 2016 to 2019. When the hospital discharged BH, he was voluntarily taking 4 mg of risperidone, an antipsychotic medication, each day.

In 2022, BH was in jail on new charges, including fourth degree assault and third degree theft, when he punched a jail guard. The State then charged BH with third degree assault for the jail incident.

The trial court ordered a competency evaluation. Based on that evaluation, the court found that BH lacked the capacity to understand the nature of the proceedings against him and to assist in his own defense, meaning that he was not competent to stand trial. The trial court also found BH was not likely to regain competency within a reasonable period of time. The trial court dismissed the charge and committed BH to Western State Hospital for 120 hours for evaluation. At the end of the evaluation period, the physicians in charge of BH's care at the hospital petitioned for 180 days of involuntary treatment.

The petition detailed BH's history with the hospital, including his prior 31-month stay and that he had been discharged. The examining physician diagnosed BH with schizoaffective disorder and substance use disorder, opining that "[w]ithout treatment . . . he [was] at increased risk of continued psychiatric decompensation which could lead to additional risky behavior resulting in similar criminal charges." Clerk's Papers (CP) at 13.

Following a hearing, the trial court concluded that BH was gravely disabled and that he presented a likelihood of serious harm and of repeating acts similar to his charged criminal

behavior. The court made several findings of fact to support these conclusions. It cited BH's long history of mental health treatment; diagnoses of psychosis, schizoaffective disorder, and substance abuse disorder; the underlying assault in this case; and the evaluating physician's testimony of BH's inappropriate comments during the formal evaluation, verbal aggression towards hospital staff, and inability to meet his own basic health and safety needs. Accordingly, the trial court ordered BH committed for 180 days.

During this 180-day commitment period, Western State Hospital's examining physician petitioned for involuntary administration of antipsychotic medications for BH. The doctor emphasized BH's assaultive behavior towards his peers, disruption to the ward, and lack of improvement over the preceding two months of treatment. The trial court denied the petition.

B.      Current Commitment and Involuntary Treatment Order

The next month, the physicians charged with BH's care petitioned for an additional 180 days of involuntary treatment for BH. The declaration in support of the petition included a recitation of his recent assaultive behavior against both staff and other patients. *See* CP at 130-32 (describing closed fist punches, throwing urine, squeezing a patient around the neck, starting fights, destroying others' property). The trial court granted the petition.

The physicians also petitioned again for involuntary administration of antipsychotic medication. The petition stated that BH had been taking up to 3 mg of risperidone. When that proved insufficient, his psychiatrist, Dr. Liban Rodol, attempted to increase the dosage to 5 mg, and BH began refusing the medication altogether. Dr. Rodol reported that BH "said medications affected his ability to be creative and his ability to dream and practice his Native American religion and spiritual beliefs." CP at 166.

3

The petition stated that BH had "recently threatened, attempted or caused serious harm to others." CP at 168. It detailed four instances over a two-month period where BH had instigated fights with his peers and "reportedly swung closed fist at staff." CP at 168. The petition also asserted that, without treatment, BH would suffer severe deterioration in routine functioning and would likely need to be detained for a substantially longer period of time. It also explained that alternatives to forced medication were considered but they would not be effective— they would be more intrusive, and they would prolong BH's involuntary detention. The petition sought permission to involuntarily treat BH with one of two antipsychotic medication regimens: up to 16 mg of oral risperidone with a backup of up to 30 mg of intramuscular olanzapine, or up to 50 mg of oral olanzapine with a backup of up to 30 mg of intramuscular olanzapine.

1.    Testimony and events at the involuntary medication hearing

During the hearing, the trial court commissioner heard testimony from Dr. Rodol. Dr. Rodol testified that BH's symptoms included "[m]ood instability, labile affect, disorganized speech, pressured speech, hypersexual behavior at times, being irritable, aggressive, increased psychomotor agitation, . . . difficulty controlling his behavior and managing his behavior." CP at 213. Dr. Rodol further testified that BH placed himself in danger of getting assaulted by his peers by antagonizing them and getting into fights. In the days before the hearing, BH punched and strangled a nurse, ran into another patient's room to jump on their desk, shattered another patient's phone by "banging" the receiver against the wall, and attempted to break the nurse's station door handle. CP at 218.

Dr. Rodol stated that, although the petition requested up to the state hospital's maximum dose of 16 mg of risperidone, he did not expect to "get anything close to that." CP at 215. He said

4

that in the past, BH was released on 4-to-5 mg and that a typical patient range was 4-to-8 mg. However, he could not predict the dose BH would need because "without treatment[] the symptoms tend to become more treatment resistant[,] . . . [s]o it might require more medication dosages as a result." CP at 216. He also explained the process of titrating the medication by increasing the dosage by no more than 2 mg each day and evaluating the results.

While risperidone was the first medication choice, olanzapine was necessary to provide a short-acting injectable option should BH refuse the oral medication. Dr. Rodol also testified that olanzapine was a backup in case treatment with risperidone was not successful and as a means to offer BH a choice in his medication. When asked to compare risperidone to olanzapine, Dr. Rodol explained that they are both second-generation or atypical antipsychotics that are "very similar" in how they work, their therapeutic effect, and their side effects. CP at 224. He also stated that "[t]here is no risk" associated with switching between the two medications. CP at 225.

Dr. Rodol testified that BH objected to taking risperidone because it "interfere[d] with his ability to be creative, to dream, daydream, and to practice his Native American religion and spiritual beliefs. And another time, [BH] said that he didn't need to be on any medications[,] that he was just doing fine." CP at 214-15. When asked if risperidone could have the effect of dimming creativity, Dr. Rodol stated that he didn't think so, unless by creativity BH meant his manic symptoms, including flight of ideas, which the medication was intended to alleviate.

BH attended the hearing by Zoom. During Dr. Rodol's testimony, BH stood to urinate in the corner of the room. After briefly rejoining the call, BH got up to leave once more, slamming the computer and attempting to assault an officer before running out of the room. At the close of testimony, the commissioner determined BH "voluntarily absented himself by virtue of his

conduct." CP at 231. The commissioner then immediately began to issue findings before BH's counsel interrupted asking for his final arguments to be heard. In closing argument, BH's counsel requested that the court limit the medications to a lower dose than the maximum dose the petitioners sought.

> 2.      <u>Commissioner's ruling and subsequent events</u>

The commissioner authorized the medication, finding that there was a compelling state interest to involuntarily medicate BH because he had recently threatened, attempted, or caused serious harm to himself or others; would suffer severe deterioration in routine function without treatment; and would likely be detained for a substantially longer period of time, at an increased cost to the State, without treatment. Additionally, the commissioner entered findings incorporating Dr. Rodol's testimony that BH had been stable on 4-to-5 mg of risperidone but decompensated without it, including demonstrating aggression shortly before and during the hearing by destroying property at the hospital and attempting to assault an officer during the hearing. The commissioner declined to place the requested limits on dosage, stating, "[T]his Court is not going to be on a daily supervision for a medical professional like Dr. Rodol." CP at 235.

On the order, the commissioner checked a preprinted box stating that BH had refused to consent to treatment and noted that he objected because the medication interfered with his ability to practice his Native American religion. In contrast, the commissioner also checked a box indicating that BH had not expressed any religious or moral objections to the medication. Nonetheless, the commissioner again noted BH's belief that the medication interfered with his spiritual and Native American beliefs, although he had taken medication in the past. Finally, the commissioner found that BH would consent to the medication if he were capable of making a

rational decision and therefore substituted the court's judgment for that of BH. The court explained that alternatives to forced medication would not be as effective and they would be likely to prolong involuntary treatment. The commissioner found that treatment with antipsychotic medications was necessary and effective and authorized the doctor to involuntarily treat BH with authorized "[a]ntipsychotic medications as requested in the Petition." CP at 180.

BH moved to revise the order, seeking revision of several findings, including the finding that he had no religious objection to the medication. A trial court judge denied the motion. BH appeals.

ANALYSIS

I. MAXIMUM DOSE OF RISPERIDONE

While BH does not contest the administration of risperidone at "standard dosages," he argues that the State did not meet its burden to prove that the maximum dosage of risperidone was necessary and effective. Br. of Appellant at 17. BH contends that he previously took between 4 and 5 mg of risperidone voluntarily with successful results, and the typical patient only requires between 4-to-8 mg. So, Dr. Rodol's assertion that BH "'might'" have become treatment resistant does not justify an authorization of up to 16 mg. *Id.* at 20.

BH also argues that it is the trial court's duty to oversee the authorizations in an involuntary medication order. He contends that an increase of this proportion is not "narrowly drawn . . . consistent with the evidence presented." *Id.* at 21. We disagree.

A.   Standard of Review and Involuntary Medication Cases

On appeal, "[w]e review the superior court's ruling, not the commissioner's decision." *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d 975 (2020). But "the findings and orders of a

7

court commissioner not successfully revised become the orders and findings of the superior court." *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017).

Where the threshold is "clear, cogent, and convincing evidence . . . the ultimate fact in issue must be shown by evidence to be 'highly probable.'" *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986) (quoting *In re Pawling*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)). We do not disturb the trial court's findings on review if the findings are "supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *Id.*

RCW 71.05.217(1)(j) provides that antipsychotic medication shall not be ordered for a patient in the State's care against the patient's consent unless the petitioning doctors provide clear, cogent, and convincing evidence of "a compelling state interest that justifies overriding the patient's lack of consent, . . . that the proposed treatment is necessary and effective, and that medically acceptable alternative forms of treatment are not available, have not been successful, or are not likely to be effective." RCW 71.05.217(1)(j)(i). The statute also requires the court to "make specific findings of fact" about whether there are any compelling state interests, "the necessity and effectiveness of the treatment" and the patient's "desires regarding the proposed treatment." RCW 71.05.217(1)(j)(ii). These standards differ from RCW 10.77.094, which regulates involuntary medication orders where the purpose is restoring the competency of a defendant to stand for trial.

The Washington Supreme Court has held that the State can limit fundamental liberty interests by medicating an involuntarily committed patient without their consent when the regulation is justified by a compelling state interest and is narrowly drawn. *In re Det. of Schuoler*, 106 Wn.2d 500, 508, 723 P.2d 1103 (1986). The court concluded that the "compelling state

interest" and "narrowly drawn" conditions are satisfied when the petitioning party proves that there is a compelling state interest and that the treatment is necessary and effective. *Id.* The necessary and effective inquiry must also include "prognosis with and without the treatment, as well alternative treatments available." *Id.* at 509. Thus, the statutorily required finding that there are no medically acceptable alternatives available that are likely to be effective would satisfy the constitutional requirement that the order be narrowly drawn. Because the statute incorporates these standards, there is no independent test for whether a regulation is narrowly drawn. *See* RCW 71.05.217(1)(j).

In *In re Det. of B.M.*, the commissioner authorized the administration of an unspecified antipsychotic drug without placing a maximum dosage limit. 7 Wn. App. 2d 70, 88, 432 P.3d 459 (2019). Although BM did not assault anyone, he was "verbally aggressive toward staff and . . . tried to instigate fights with his peers and staff." *Id.* at 86. This threat of violence was evidence that BM's commitment would be substantially prolonged without the treatment of antipsychotic medication.[1] *Id.* BM argued that the order was invalid due to the lack of dosage limit that infringed upon his constitutional rights. *Id.* at 88. The majority stated that when the purpose of an involuntary medication order is for medical reasons, rather than for purposes of competency restoration, the commissioner is not required to specify maximum dosages. *Id.* at 91. The majority explained that a psychiatrist "'must be able to titrate his existing dosages to meet his needs'" and that "'[n]o one who is being treated for a serious medical condition would benefit from a court order that restricted

---

[1] The commissioner also found that there was a compelling state interest in medicating BM because he had "'been aggressive and goading others into trying to fight and without medication it [was] likely to continue or worsen.'" *Id.* at 75 (quoting record). But the majority did not reach this finding because it affirmed based on the substantially prolonged detainment finding. *Id.*

the drugs and the dosages permissible.'" *Id.* at 91 (alteration in original) (quoting *United States v. Loughner*, 672 F.3d 731, 759 (9th Cir. 2012)). [2]

B.      Analysis

BH does not contest that there was a compelling state interest in medicating him or that alternative treatments either were not available or were not likely to be successful. Thus, we need only determine whether there was substantial evidence that treatment with risperidone up to the maximum dose was necessary and effective.

First, there is substantial evidence to support that the administration of risperidone was necessary and effective. Without it, BH engaged in behavior that put himself and those around him in danger. Dr. Rodol testified that BH's symptoms included irritability, aggression, and difficulty controlling and managing his behavior. He had placed himself and other patients in danger by antagonizing his peers and instigating physical altercations with them. He attacked staff, including punching and strangling a nurse and attempting to assault court staff during the hearing. These actions go beyond the mere threat of escalation present in *B.M.*

BH does not contest that taking risperidone is necessary and effective at a "standard dosage." But BH refused to take the medication at dosages adequate to treat his symptoms, then later refused to take it in any amount. In addition, both parties agree that risperidone had proven effective in the past, allowing BH to be discharged from a previous involuntary detention. So there is substantial evidence that the administration of risperidone is both necessary and effective.

Next, the commissioner was under no obligation to impose a maximum dosage. As in *B.M.*, the State seeks to involuntarily medicate BH for medical reasons to ensure his own and others'

---

[2] One judge dissented. *Id.*, at 92 (Bjorgen, J., dissenting).

safety, not for legal competency purposes. We agree with the *B.M.* majority's reasoning that an order for medical reasons does not require strict limitations on dosages.[3] 7 Wn. App. 2d at 91.

Furthermore, there is evidence here that such a limitation would be difficult to determine. Dr. Rodol testified that, while he anticipated the necessary dose to be close to the 4-to-5 mg that have been effective in the past, without treatment, symptoms may change over time and become more resistant, making it difficult to predict an exact dosage. He further detailed the methodology of slowly titrating the dosage until it reaches an effective amount. There is no evidence in this record that Dr. Rodol has abused that discretion or unnecessarily medicated patients in the past. We decline to substitute our judgment of permissible dosages for that of a medically licensed professional who has a duty to care for the health and safety of his patients, especially where the patient will benefit from the treating psychiatrist's ability to quickly adjust medication dosages without court intervention. Accordingly, we hold that the trial court's finding that the maximum dosage of risperidone was necessary and effective, was supported by substantial evidence.

## II. OLANZAPINE AS A BACKUP MEDICATION

BH next contends that there was not substantial evidence to support the commissioner's ruling authorizing olanzapine as a backup for risperidone. He claims that the State did not present evidence that olanzapine is a necessary and effective alternative to risperidone. He also argues that the court's failure to distinguish between the drugs by referring to them generically as

---

[3] The dissent did not address the maximum dosage argument. *B.M.*, 7 Wn. App. 2d at 96 (Bjorgen, J., dissenting). Instead, Judge Bjorgen dissented on grounds that an effective alternative treatment existed and that there was no evidence of actual violence, only "aggressive and goading" behavior. *Id.* at 98-99. Here, BH does not identify specific alternative treatments that would be effective. And there is evidence in this record that BH assaulted both patients and staff.

"'antipsychotic medications'" was an abuse of discretion and that the order authorizing multiple drugs was not narrowly drawn. Br. of Appellant at 22 (quoting record). We disagree.

Here, there is substantial evidence that the commissioner's authorization of olanzapine as a backup was necessary, effective, and narrowly drawn. First, olanzapine is necessary as a short-acting injectable option, as a backup in case treatment with risperidone is not successful and as a means to offer BH a choice in his medication. While Dr. Rodol requested risperidone as the first choice due to the successful prior use, it cannot be involuntarily administered if BH refuses oral medication. At the time of the hearing, BH was refusing risperidone in all dosages, so there was evidence to support the necessity of authorizing a drug that can be injected when necessary.

Second, there is evidence to support the finding that olanzapine is an effective treatment for schizoaffective disorder. It is not disputed that risperidone had been effective in treating BH's condition, or that olanzapine shares its relevant characteristics. Both drugs are second-generation (or atypical) antipsychotics and are "very similar" in both how they work and their therapeutic effects. CP at 224. Furthermore, Dr. Rodol testified that "[t]here is no risk" in switching BH between the two medications, if needed. CP at 225.

Third, the order was narrowly drawn. The order did not generically authorize "antipsychotic medications." It authorized "[a]ntipsychotic medications as requested in the Petition." CP at 180. The petition specifies the antipsychotic medications sought as "risperidone up to 16 mg with [intramuscular] backup olanzapine up to 30 mg if he refuses [oral] risperidone." CP at 167. It is not disputed that there was a compelling state interest in ensuring the safety of BH and those around him. And as discussed above, olanzapine was a necessary and effective treatment. The order explained that no alternative would be effective and without these medications, BH's

detention would likely be prolonged. Thus, the trial court's order in this case was narrowly drawn as contemplated by *Schuoler*.

We hold that the commissioner did not err when he approved olanzapine as an alternative when the drugs worked in the same way and there were no consequences from switching between the two.

### III. RELIGIOUS OBJECTIONS

Finally, BH argues that the commissioner failed to adequately consider BH's desires and religious objections to the proposed treatment. First, BH reasons that the commissioner misinterpreted the court's role in monitoring the decisions of medical professionals because he left Dr. Rodol to make his own daily medication decisions. Second, BH argues that the commissioner "did not fairly consider" or "disbelieved" BH's religious objections. Br. of Appellant at 25-26. To support this, he points to the fact that the commissioner began to make his ruling prior to hearing BH's closing argument and that, in the written order, the commissioner incorrectly checked the box indicating that BH had not expressed any religious or moral objections to the medication. This failure, BH contends, conflicts with protections for religious observance and practice required by the United States Constitution, Washington Constitution, and multiple federal laws. We disagree.

A.      Religious Freedom and Involuntary Medication

The United States Supreme Court "has held that a person 'possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment.'" *B.M.*, 7 Wn. App. 2d at 78 (quoting *Washington v. Harper*, 494 U.S. 210, 221-22, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990)). The involuntary administration of medication can also interfere with a person's First Amendment rights. *Id.* The

right to refuse antipsychotic medication extends to involuntarily committed individuals. RCW 71.05.217(1)(j). However, that right is not absolute. *State v. Adams*, 77 Wn. App. 50, 56, 888 P.2d 1207 (1995).

A court may order the involuntary administration of antipsychotic medication if doing so serves a compelling state interest, and it is narrowly tailored, meaning effective alternatives are not available. *See id.* The Washington Supreme Court has stated that the list of compelling state interests includes preserving life, protecting innocent third parties, preventing suicide, and maintaining "'the ethical integrity of the medical profession.'" *Schuoler*, 106 Wn.2d at 508 (quoting *In re Guardianship of Ingram*, 102 Wn.25d 827, 842, 723 P.2d 1103 (1986)).

The parties do not cite to a directly applicable Washington case and it does not appear that Washington courts have specifically addressed a free exercise of religion challenge to an involuntary medication order in this context, where the order is not related to competency restoration. But California's intermediate appellate court has. In *California Department of State Hospitals v. A.H.*, AH objected to taking antipsychotic medication based on his religion, despite a previous of history of taking such drugs voluntarily. 27 Cal. App. 5th 441, 446, 238 Cal. Rptr. 3d 180 (2018). There, the court said, "There is no authority that the free exercise clause exempts a psychiatric patient from being administered antipsychotic medication where the patient is a danger to [themself] or others." *Id.* It also held that there was substantial evidence to support the involuntary medication order where it "further[ed] a compelling government interest that outweigh[ed] any religious belief." *Id.* at 447.

B.     Effect of Medication on BH's First Amendment Rights

Here, there is a compelling state interest supporting the trial court's order. The commissioner found, and BH does not dispute on appeal, that BH posed a risk to himself and others. There is substantial evidence to support this finding because the record contains evidence BH assaulted hospital staff, attempted to assault hearing staff, and initiated fights with other patients. While BH devotes much of his briefing to the important role religious freedom has played in this nation, he does not overcome the State's compelling interest in protecting others from BH's assaultive behavior, nor has he identified a workable and effective alternative to involuntary medication. Applying the AH test, which we find to be reasonable, there is no First Amendment violation because the State's interest in ensuring the safety of BH and those around him outweighs the impact on BH's religious exercise.

Although BH objects to the medication impeding his ability to practice his Native American religion, he does not explain *how* his religious practice has been limited or curtailed. It is unclear exactly what religious exercise that BH cannot do or participate in while medicated. He contends that risperidone impacts his creativity and ability to dream, but he does not connect this to a specific religious practice or articulate how risperidone limits his participation. Without this, we cannot conclude that the trial court's order must be more narrowly tailored.

C.     Support for the Trial Court's Findings

The commissioner made specific findings of fact regarding BH's desires, but ultimately substituted his judgment for BH's in accordance with the Washington law. While the commissioner incorrectly selected the box indicating that BH had not expressed religious objections to the medication, he followed that finding with specific facts regarding BH's religious

objections to the treatment and BH's history with the medication. He also acknowledged BH's objections under a separate section of his findings. As a result, we conclude that the trial court inadvertently checked an incorrect box, but in context, it is clear it considered BH's arguments regarding impacts on his religious practice.

And although the commissioner did begin making his ruling before hearing BH's final arguments, those arguments did not contain new information regarding BH's religious objections to the medication. Dr. Rodol noted those objections earlier in the proceedings during his testimony. Instead, BH's closing arguments focused on placing stricter limits on the dosages of the medications. The statute only requires the commissioner to make specific findings of fact about the patient's desires regarding the medication and does not dictate how the court should weigh or consider those findings prior to deciding to substitute its judgment for the patient's. Therefore, there is significant evidence that the court made appropriate factual findings.

After considering BH's objections, the commissioner ultimately decided that BH would consent to the treatment if he were capable of making that decision. There is evidence to support this finding because BH had previously agreed to take the medication up to 4-to-5 mg. Additionally, there is testimony that the medication does not have the side effect of limiting creativity other than alleviating manic flight of ideas. We hold that the commissioner did not err by authorizing the medication despite BH's religious and spiritual objections.[4]

---

[4] BH raises RCW 71.05.217(1)(i), which provides that a detained person has a right to "not be denied access to treatment by spiritual means through prayer . . . . in addition to the treatment otherwise proposed." But BH does not explain specifically how this statute was violated. *See* Br. of Appellant at 24. BH also mentions several federal statutes, arguing that they show how important the free exercise of religion is. But he never expressly argues that the order in this case violates these statutes, nor does he explain how those statutes would be violated by the trial court's order.

No. 59318-1-II

Overall, there was substantial evidence to support the commissioner's findings of a compelling state interest that outweighed BH's religious objections. The commissioner did not err by entering the involuntary medication order.

CONCLUSION

We affirm the involuntary medication order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

MAXA, J.

CRUSER, C.J.

17